RECEIVED
NOV 29 2018
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA
BY_____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | 2:18-cr-00335-01 |
| | * | Judge UDJ |
| | * | Magistrate Judge Kay |
| | * | |
| | * | 18 U.S.C. § 371 – Conspiracy |
| | * | |
| versus | * | 33 U.S.C. § 1908(a) - Knowing |
| | * | Failure to Maintain an Accurate Oil |
| | * | Record Book |
| | * | |
| | * | 18 U.S.C. § 1519 - Falsification of |
| | * | Records |
| | * | |
| VJACESLAVS BIRZAKOVS | * | 18 U.S.C. § 1505 - Obstruction of |
| Defendant | * | Justice |

**INDICTMENT**

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment:

**COUNT ONE**
Conspiracy, 18 U.S.C. § 371

    **A.    THE DEFENDANT**

    1.    Defendant **VJACESLAVS BIRZAKOVS,** a Latvian citizen, served as the Master (also known as the "Captain") of the oil tanker RIDGEBURY ALEXANDRA Z from on or about June 23, 2017, to on or about September 8, 2017. As Master, Defendant **BIRZAKOVS** had overall responsibility for the safe operation of the RIDGEBURY ALEXANDRA Z and for compliance with U.S. and international law, including

1

supervising the officers and crew, and accurately maintaining the ship's Oil Record Book Parts 1 and 2. Prior to serving as a Master, Defendant **BIRZAKOVS** graduated from the St. Petersburg Maritime Academy in 1983, and worked as a Mate from 1983 to 1993. In 1993, Defendant **BIRZAKOVS** became a Chief Officer, and then in 1998, he became a Master. From 2004 to 2008, Defendant **BIRZAKOVS** worked as a "rolling training Master," going from vessel to vessel within his employer's fleet of vessels, providing training to the various crews and Masters and conducting internal audits to ensure compliance with, among other things, vessel pollution laws and regulations.

**B.   THE RIDGEBURY ALEXANDRA Z**

2. The RIDGEBURY ALEXANDRA Z was a 29,905 gross ton ocean-going oil tanker, with International Maritime Organization (IMO) Number 9439785, registered under the flag of the Marshall Islands. The RIDGEBURY ALEXANDRA Z had a crew of approximately 22 individuals, who were citizens of Russia, Ukraine, Latvia, and the Philippines. Approximately 13 crew members handled cargo and navigated the ship. These crew members worked for the Chief Officer, who in turn reported directly to the Master, Defendant **BIRZAKOVS**. An additional 7 crew members worked in the engine room, operating and maintaining the ship's primary and auxiliary engines and equipment. These crew members worked for the Chief Engineer, who in turn reported directly to the Master, Defendant **BIRZAKOVS**.

3. On or about September 8, 2017, the U.S. Coast Guard conducted an inspection of the RIDGEBURY ALEXANDRA Z in Lake Charles, Louisiana, to determine compliance with U.S. law. During the course of the inspection, Coast Guard officials received information from a crewmember that the vessel's crew had illegally discharged

oil cargo residue overboard during the voyage to the United States from Mexico. The crewmember provided the Coast Guard with video and photographic evidence.

### C.    LEGAL FRAMEWORK

4.   The United States is part of an international regime that regulates discharges of oil from vessels at sea known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 ("MARPOL"). MARPOL was enacted into United States law by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901-1915. The regulations promulgated under APPS apply to all commercial vessels over 150 gross tons that carry oil in bulk as cargo while operating in United States waters or while at a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States. 33 C.F.R. § 151.09(a)(5).

5.   On large oil tankers carrying oil cargo in bulk, such as the RIDGEBURY ALEXANDRA Z, the oil cargo tanks are periodically cleaned using a combination of other oil products, salt water, and fresh water. The mixture of oil and water, known as oil cargo residue, settles in the cargo tanks and then is transferred to separate storage tanks for disposal. Depending on the ship's construction, these tanks are generally referred to as slop tanks, but may also be called residual oil tanks. As these slop tanks contain oily mixtures, the discharge of their contents to the sea is prohibited under MARPOL and U.S. law unless very specific conditions are met. To properly discharge the contents of the slop tanks to the sea, the ship must be more than 50 nautical miles from the nearest land; proceeding en route; the oil content in the discharge must not exceed 30 liters per nautical mile at any time during the discharge operation; the total quantity of oil

discharged must not exceed 1/30,000 of the total quantity of cargo previously carried; the point of discharge must be visible from the ship; the ship must have in operation an oil discharge monitoring and control system, often referred to as oil discharge monitoring equipment (ODME) designed to ensure the mixture being discharged is in compliance. Alternatively, the only other option for disposal of oil cargo residue is to transfer it ashore for processing.

6. Consistent with MARPOL and the APPS regulations, an oil tanker of 150 gross tons and above must have in operation an oil discharge monitoring and control system, or ODME comprised of: an oil content meter (hereinafter "OCM") to measure the oil content of the effluent; a flow rate indicating system (or "flow meter") to measure the rate of effluent being discharged; a ship's speed indicating device; a ship position indicating device; a sampling system to convey a representative sample of the effluent to the OCM; an overboard discharge control to stop the discharge; an interlock to prevent the discharge overboard of any effluent unless the system is fully operational; and, a control system that processes the information. 33 C.F.R. § 157.12d(a)(4).

7. On oil tankers such as the RIDGEBURY ALEXANDRA Z, machinery space bilge water accumulates in wells in the bilges, the bottommost part of the vessel. Machinery space bilge water consists of water originating from spills and leaks from piping, tanks, other machinery, or from condensation. This water may be contaminated with oil, oil residue, lubrication fluids, and other liquids that leak or drip from engines or pipes and hoses that run throughout the ship. There can be more than one machinery space bilge on a vessel. A machinery space bilge as that term is used in the regulation means spaces on a ship containing a bilge and machines that use oil and are capable of

generating oil waste. In order to maintain bilge wastes at safe levels, the bilges must periodically be emptied. This can be done in one of two ways: (1) machinery space bilge water can be discharged ashore to a waste reception facility; or, (2) it may be pumped over the side of the ship after being processed through a properly functioning Oil Water Separator ("OWS"). Pursuant to MARPOL and APPS, machinery space bilge water may be discharged overboard into the ocean only if it contains 15 parts per million ("ppm") or less concentration of oil. 33 C.F.R. § 151.10. The principal technology used to lower the oil content of oil-contaminated waste is an OWS, which includes an OCM to detect and prevent concentrations of oil in excess of 15 ppm from being discharged overboard.

8. Consistent with the requirements contained in MARPOL Annex I, the APPS regulations require that each oil tanker of more than 150 gross tons maintain a record known as an Oil Record Book Part 1. In this part of the Oil Record Book, transfers of oil, the disposal of sludge and waste oil, and overboard discharges or disposal otherwise of bilge water that has accumulated in machinery spaces, must be fully and accurately recorded by the person or persons in charge of the operations. 33 C.F.R. § 151.25(a) and (d); MARPOL Annex I Regulation 17. Also consistent with the requirements contained in MARPOL Annex 1, APPS regulations require that an oil tanker of 150 gross tons and above maintain an Oil Record Book Part 2. In this part of the Oil Record Book, all discharges of water from slop tanks, disposal of oil residue, and any failure of the oil discharge monitoring and control system along with the reasons for the failure must be recorded. 33 C.F.R. § 151.25(a) and (e); MARPOL Annex 1 Regulation 36. Specifically, discharges or disposals otherwise of bilge water that has accumulated in machinery spaces and of the contents of cargo and slop tanks must be fully recorded, without delay,

in the Oil Record Book Part 1 and/or Part 2 by the person in charge of the operations. Each completed page of the Oil Record Book Parts 1 and 2 shall be signed by the Master or other person having charge of the ship. 33 C.F.R. § 151.25(h); MARPOL Annex 1 Regulations 17.4 and 36.5. The Master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record. 33 C.F.R. § 151.25(j). The Oil Record Book Parts 1 and 2 must also contain entries concerning any emergency, accidental, or other exceptional discharges of oil or oily mixtures including a statement of the circumstances of, and the reasons for, the discharge. 33 C.F.R. § 151.25(g); MARPOL Regulations 17.3; 36.4. The Oil Record Book must be maintained onboard the vessel for not fewer than three years, and be readily available for inspection at all reasonable times. 33 C.F.R. § 151.25(i), (k); MARPOL Regulations 17.6 and 36.7.

9. The U.S. Coast Guard, a component of the U.S. Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. § 89(a) to board vessels and conduct inspections and investigations of potential violations of international and United States law, including MARPOL and APPS. In conducting a certain type of inspection, commonly known as a Port State Control inspection, Coast Guard personnel rely on the statements of the vessel's crew and documents, including information contained in the Oil Record Book. The Coast Guard is specifically authorized to examine the vessel's Oil Record Book to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate operating procedures; whether it poses any danger to United States' ports and waters; and, whether the vessel has discharged any oil in violation of MARPOL, APPS, or any

applicable federal regulations. 33 C.F.R. § 151.23(a)(3), (c). If the Coast Guard finds evidence that a vessel is not in substantial compliance with MARPOL or APPS, it may deny a vessel's entry into a United States' port or detain the vessel until it is determined that the vessel does not present an unreasonable threat to the marine environment. 33 C.F.R. §§ 151.07(b), 151.23(b).

**D. THE ALLEGED CONDUCT**

OBJECTS OF THE CONSPIRACY

10. Beginning in or about June 2017, and continuing through on or about September 8, 2017, in the Western District of Louisiana and elsewhere, Defendant

**VJACESLAVS BIRZAKOVS**

did knowingly and willfully combine, confederate, conspire, and agree with others known and unknown to the Grand Jury, to:

a. Knowingly fail to maintain an accurate Oil Record Book Part 1 and Part 2 for the RIDGEBURY ALEXANDRA Z in which all discharges overboard and disposals otherwise of bilge water that had accumulated in machinery spaces were fully and accurately recorded, where all discharges of water from slop tanks, disposal of oil residue, and any failure of the oil discharge monitoring and control system along with the reasons for the failure were fully and accurately recorded, and where any emergency, accidental, and other exceptional discharges of oil and oily mixtures were recorded, in violation of Title 33, United States Code, section 1908(a) and Title 33, Code of Federal Regulations, §151.25(a), (d), (e), (g), and (h);

b. Knowingly alter, conceal, cover up, falsify and make a false entry in any record and document with the intent to impede, obstruct and influence the investigation and proper administration of a matter within the jurisdiction of the U.S. Coast Guard, a component of the Department of Homeland Security, and in relation to and in contemplation of a matter, namely, the U.S. Coast Guard's inspection to determine the RIDGEBURY ALEXANDRA Z's compliance with MARPOL and APPS, in violation of Title 18, United States Code, Section 1519;

c. Corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under a proceeding by the U.S. Coast Guard, a component of the Department of Homeland Security, during a vessel inspection of the RIDGEBURY ALEXANDRA Z to determine the vessel's compliance with MARPOL and APPS, in violation of Title 18, United States Code, Section 1505.

## MANNER AND MEANS OF THE CONSPIRACY

11. Defendant and co-conspirators, known and unknown, concealed, covered up, falsified, made false entries, omitted entries and caused the foregoing in the Oil Record Book Parts 1 and 2 to cover up the fact that the RIDGEBURY ALEXANDRA Z's engine room oily bilge water had been transferred from the vessel's Bilge Holding Tank to the vessel's Port Slop Tank and that the vessel's oil discharge monitoring and control system (ODME) was operated incorrectly in order to allow oily bilge water and oil residue to be discharged into the sea without being properly processed in violation of MARPOL and APPS.

12. Defendant and co-conspirators, known and unknown, directed and caused to be directed certain crewmembers to flush the oil discharge monitoring and control system's OCM with fresh water to "trick" the OCM into allowing the discharge of oily bilge water and oil residue into the sea and then took measures to conceal that the system had been tampered with.

13. Defendant and co-conspirators, known and unknown, made materially false statements and representations to the U.S. Coast Guard when the RIDGEBURY ALEXANDRA Z was being inspected in a United States port.

14. Defendant and co-conspirators, known and unknown, withheld information in order to keep the transfer of engine room oily bilge water from the Bilge Holding Tank to the Port Slop Tank, the fresh water flushing or "tricking" of the OCM, and the falsity of the Oil Record Book Parts 1 and 2 from the U.S. Coast Guard.

## OVERT ACTS

OVERT ACT 1: In or about July 2017, Defendant **VJACESLAVS BIRZAKOVS** met with the vessel's Chief Engineer and the vessel's Chief Officer, and discussed the Chief Engineer's desire to transfer oily bilge water from the Bilge Holding Tank in the vessel's engine room to the Port Slop Tank. Defendant gave the Chief Engineer permission to make that transfer.

OVERT ACT 2: In or about July 2017, the vessel's Chief Engineer removed uniquely numbered seals that prevented the use of certain valves in the engine room in order to make the transfer of oily bilge water from the Bilge Holding Tank to the Port Slop Tank.

OVERT ACT 3: In or about July 2017, and with the Defendant's permission, the vessel's Chief Engineer transferred oily bilge water from the Bilge Holding Tank to the Port Slop Tank.

OVERT ACT 4: In or about July 2017, the vessel's Chief Engineer replaced uniquely numbered seals on the valves in the engine room that were used to make the transfer of oily bilge water from the Bilge Holding Tank to the Port Slop Tank.

OVERT ACT 5: In or about July 2017, the Chief Engineer falsified the vessel's seal log in order to hide the fact that the valves had been used to transfer oily bilge water from the Bilge Holding Tank to the Port Slop Tank.

OVERT ACT 6: In or about July 2017, Defendant signed the completed pages of the Oil Record Book Part 1 that failed to record the internal transfer of oily bilge water from the Bilge Holding Tank in the vessel's engine room to the Port Slop Tank, as required by MARPOL and the APPS regulations.

OVERT ACT 7: In or about July 2017, Defendant signed the completed pages of the Oil Record Book Part 2 that failed to record the transfer of oily bilge water from the Bilge Holding Tank in the vessel's engine room to the Port Slop Tank, as required by MARPOL and the APPS regulations.

OVERT ACT 8: On or about July 14, 2017, the vessel's Chief Officer attempted to discharge the oily mixtures contained in the vessel's Port Slop Tank without manipulating the ODME, but the OCM detected that the effluent contained too much oil and prevented the discharge.

OVERT ACT 9: On or about July 14, 2017, the vessel's Chief Officer briefed his supervisor, Defendant **BIRZAKOVS**, regarding the ODME preventing the overboard

discharge of the oily mixtures in the Port Slop Tank due to too much oil being detected in the effluent. Defendant told the Chief Officer to try and conduct the discharge again on the following day.

OVERT ACT 10: On or about July 15, 2017, the Chief Officer again attempted to discharge the oily mixtures contained in the vessel's Port Slop Tank without manipulating the ODME, but the OCM still detected that the effluent contained too much oil and prevented the discharge.

OVERT ACT 11: On or about July 15, 2017, the vessel's Chief Officer again briefed his supervisor, Defendant **BIRZAKOVS**, regarding the ODME continuing to prevent the overboard discharge of the oily mixtures in the Port Slop Tank due to too much oil being detected in the effluent. Defendant told the Chief Officer to change the ODME from "AUTO" to "MANUAL" mode, and to manually input the ppm of oil to 400, thus overriding the OCM. The Chief Officer objected strongly to this order from the Defendant, explaining that this was illegal and would leave an electronic record of the change in operational mode and thus increase the chance of detection by authorities.

OVERT ACT 12: On or about July 15, 2017, Defendant and the Chief Officer went to the ODME and ordered another crew member to disconnect the effluent sample line so that they could visually inspect the effluent. The Defendant and the Chief Officer saw and touched the oily mixture from the sample line, which appeared brown in color.

OVERT ACT 13: On or about July 15, 2017, Defendant told the Chief Officer to add fresh water to the sample line in order to "trick" the ODME's OCM into allowing an overboard discharge.

OVERT ACT 14: On or about July 15, 2017, the Chief Officer instructed another crewmember, the Pump Man, to connect a fresh water hose to the ODME's OCM sample line.

OVERT ACT 15: On or about July 15, 2017, the Chief Officer and Pump Man discharged oily mixtures overboard while flushing the OCM with fresh water.

OVERT ACT 16: On or about July 15, 2017, after the Pump Man objected to tampering with the ODME, the Chief Officer told the Pump Man that Defendant **BIRZAKOVS** knew about the tampering of the ODME in order to convince the Pump Man to participate.

OVERT ACT 17: On or about July 15, 2017, the Chief Officer made a false and fictitious entry in the Oil Record Book Part 2 stating that 332 cubic meters (approximately 87,705 gallons) had been discharged overboard from the Port Slop Tank using of the ODME but without disclosing that the ODME's OCM had been flushed with fresh water during the discharge.

OVERT ACT 18: In or about July 2017, the Defendant signed the completed page of the ORB Part 2 containing the entry for the discharge of the contents of the Port Slop Tank using the ODME and without disclosing that the OCM had been flushed with fresh water during the discharge.

OVERT ACT 19: In or about July 2017, the Chief Officer ordered a subordinate crewmember to paint the ODME oil content sample line connections to conceal the fact that these connections had been tampered with in order to connect the fresh water hose and trick the OCM into detecting a lower oil content than what was actually being discharged.

OVERT ACT 20: On or about August 1, 2017, Defendant **BIRZAKOVS** caused the RIDGEBURY ALEXANDRA Z to enter the navigable waters and internal waters of the United States in the port of Houston, Texas.

OVERT ACT 21: On or about August 2, 2017, Defendant **BIRZAKOVS** caused the RIDGEBURY ALEXANDRA Z to enter the navigable waters and internal waters of the United States in the port of Baton Rouge, Louisiana.

OVERT ACT 22: On or about August 24, 2017, Defendant **BIRZAKOVS** caused the RIDGEBURY ALEXANDRA Z to enter the navigable waters and internal waters of the United States in the port of Lake Charles, Louisiana.

OVERT ACT 23: On or about August 24, 2017, Defendant **BIRZAKOVS** caused the RIDGEBURY ALEXANDRA Z to enter the navigable waters and internal waters of the United States in the port of Corpus Christi, Texas.

OVERT ACT 24: On or about September 7, 2017, Defendant **BIRZAKOVS** caused the RIDGEBURY ALEXANDRA Z to enter the navigable waters and internal waters of the United States in the port of Lake Charles, Louisiana.

OVERT ACT 25: On or about September 8, 2017, during the U.S. Coast Guard vessel inspection of the RIDGEBURY ALEXANDRA Z to determine the vessel's compliance with MARPOL and APPS, the Chief Engineer made false statements denying the internal transfer of oily bilge water from the Bilge Holding Tank to the Port Slop Tank.

OVERT ACT 26: On or about September 8, 2017, during the U.S. Coast Guard vessel inspection of the RIDGEBURY ALEXANDRA Z to determine the vessel's

compliance with MARPOL and APPS, the Chief Officer falsely denied knowledge of tampering with the ODME.

OVERT ACT 27: On or about September 8, 2017, during the U.S. Coast Guard vessel inspection of the RIDGEBURY ALEXANDRA Z to determine the vessel's compliance with MARPOL and APPS, Defendant **BIRZAKOVS** falsely denied knowledge of any manipulation of the ODME and falsely denied giving any order to circumvent or manipulate the ODME.

All in violation of Title 18, United States Code, Section 371.  [18 U.S.C. § 371].

## COUNT TWO
Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a)

1. Sections A through C of Count One of this Indictment are specifically incorporated and re-alleged herein.

2. On or about September 8, 2017, in the Port of Lake Charles, Louisiana, and within the Western District of Louisiana, and elsewhere, Defendant

**VJACESLAVS BIRZAKOVS**

did knowingly fail and cause the failure to maintain an accurate Oil Record Book Part 1 for the RIDGEBURY ALEXANDRA Z. Specifically, the Defendant failed to maintain and caused the failure to maintain an Oil Record Book Part 1 that fully and accurately recorded all overboard discharges and disposal otherwise of bilge water that had accumulated in machinery spaces, in violation of Title 33, United States Code, Section 1908(a), Title 33 Code of Federal Regulations, Section 151.25(a), (d)(4), (h), (j) and MARPOL Regulation 17.  [33 U.S.C. § 1908(a)].

## COUNT THREE
Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a)

1.     Sections A through C of Count One of this Indictment are specifically incorporated and re-alleged herein.

2.     On or about September 8, 2017, in the Port of Lake Charles, Louisiana, and within the Western District of Louisiana, and elsewhere, Defendant

### VJACESLAVS BIRZAKOVS

did knowingly fail and cause the failure to maintain an accurate Oil Record Book Part 2 for the RIDGEBURY ALEXANDRA Z. Specifically, the Defendant failed to maintain and caused the failure to maintain an Oil Record Book Part 2 that fully and accurately recorded all discharges of water from slop tanks, disposal of oil residue, and any failure of the oil discharge monitoring and control system (ODME) along with the reasons for the failure and where any emergency, accidental, and other exceptional discharges of oil and oily mixtures were recorded, in violation of Title 33, United States Code, section 1908(a), Title 33, Code of Federal Regulations, Section 151.25(a), (e)(7), (e)(11), (g), (h), (j), MARPOL Regulations 31, 34, and 36.  [33 U.S.C. § 1908(a)].

## COUNT FOUR
Obstruction of Justice, 18 U.S.C. § 1519

1.     Sections A through C of Count One of this Indictment are specifically incorporated and re-alleged herein.

2.     Beginning at some point unknown, but no earlier than June 2017, and continuing to on or about September 8, 2017, in the Port of Lake Charles, Louisiana, and within the Western District of Louisiana, and elsewhere, Defendant

### VJACESLAVS BIRZAKOVS

did knowingly conceal, cover up, and falsify, and make false entries and omissions, in a record and document, that is, a false, fictitious, and misleading Oil Record Book Part 1 for the RIDGEBURY ALEXANDRA Z with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, namely the U.S. Coast Guard, a component of the Department of Homeland Security, and in relation to and in contemplation of such matter, namely, a Port State Control vessel examination and inspection to determine compliance with MARPOL and U.S. law, in violation of Title 18, United States Code, Section 1519. [18 U.S.C. § 1519].

### COUNT FIVE
Obstruction of Justice, 18 U.S.C. § 1519

1. Sections A through C of Count One of this Indictment are specifically incorporated and re-alleged herein.

2. Beginning at some point unknown, but no earlier than June 2017, and continuing to on or about September 8, 2017, in the Port of Lake Charles, Louisiana, and within the Western District of Louisiana, and elsewhere, Defendant

### VJACESLAVS BIRZAKOVS

did knowingly conceal, cover up, and falsify, and make false entries and omissions, in a record and document, that is, a false, fictitious, and misleading Oil Record Book Part 2 for the RIDGEBURY ALEXANDRA Z with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, namely the U.S. Coast Guard, a component of the Department of Homeland Security, and in relation to and in contemplation of such matter, namely, a Port State Control vessel examination and inspection to determine

compliance with MARPOL and U.S. law, in violation of Title 18, United States Code, Section 1519. [18 U.S.C. § 1519].

## COUNT SIX
Obstruction of Justice, 18 U.S.C. § 1505

1.  Sections A through C of Count One of this Indictment are specifically incorporated and re-alleged herein.

2.  On or about September 8, 2017, in the Port of Lake Charles, Louisiana, and within the Western District of Louisiana, and elsewhere, Defendant

**VJACESLAVS BIRZAKOVS**

did corruptly influence, obstruct and impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under a pending proceeding by the U.S. Coast Guard, an agency within the Department of Homeland Security. Specifically, during the aforementioned period of time and during a U.S. Coast Guard vessel inspection of the RIDGEBURY ALEXANDRA Z to determine the vessel's compliance with MARPOL and U.S. law, the Defendant

    a.    made false statements to U.S. Coast Guard personnel during a Coast Guard inspection on or about September 8, 2017, by stating that he was unaware of any manipulation of the vessel's ODME system when in fact he knew then and there that the ODME system had been manipulated by flushing the system's oil content meter with fresh water; and

    b.    made false statements to U.S. Coast Guard personnel during a Coast Guard inspection on or about September 8, 2017, by stating that he did not give any order to circumvent or manipulate the ODME in any manner knowing

then and there that he did in fact order the Chief Officer to manipulate the ODME OCM with fresh water.

All in violation of Title 18, United States Code, Section 1505. [18 U.S.C. § 1505].

A TRUE BILL.

**REDACTED**

Grand Jury Foreperson

DAVID C. JOSEPH
United States Attorney

By: _____
DANIEL J. McCOY, La. Bar No. 29334
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone: (337) 262-6618

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

By: _____
STEPHEN DA PONTE, FL Bar No. 58454
Trial Attorney
Environment & Natural Resources Division
Environmental Crimes Section
601 D Street NW
Washington, D.C. 20004
Telephone: (202) 305-2729