3D MARINE Marine Consultants and Surveyors

3D MARINE USA, INC.
12411 Donna Drive, Houston, Texas 77067
Tel (281) 444-9495 (24 hours) Fax (281) 444-8874
e-mail: firm@3dmarine.com

2nd May 2019 Our Ref. No.: JOW/13354/MAF/19L

Jones Walker LLP
201 St. Charles Ave, Suite 5100
New Orleans, LA 70170

Attn: Mr. Michael W. Magner

Re: Case No. 2:18-cr-00335
*United State of America vs. Vjaceslavs Birzakovs*
In the United States District Court for the Western District of Louisiana, Lafayette Division

Dear Mr. Magner,

At the request of Jones Walker LLP, 201 St. Charles Ave, Suite 5100, New Orleans, Louisiana 70170, 3D Marine Consultants reviewed the following provided documentation regarding the above detailed matter:

1) United States Coast Guard - Marine Safety Laboratory Report, dated 15th September 2017;
2) United States Coast Guard – Marine Safety Unit Lake Charles Referral, dated 18th September 2017;
3) Oilcon Mark 6M Manual;
4) ODME Reports, Packaged Files, 2017;
5) United States Coast Guard Investigative Service Action Report
6) Documents, INTERORIENT001 to INTERORIENT083;
7) Chief Officer Oleg Prokhoda Statement, dated 13th September 2017;
8) Martin Ottoway Report, dated 27th February 2018; and
9) Expert Disclosures for Commander Daniel Cost, dated 25th April 2019.

In addition to the above, we also met with Captain Vjaceslavs Birzakovs at Lafayette, Louisiana on 29th April 2019.

After review of the above detailed statements, reports and documentation; and our years of professional experience, education and knowledge of the maritime industry; we report as follows:

As a United States Coast Guard Licensed Officer, the undersigned has served as Master, Deck Officer and certificated Tankerman – Person in Charge (PIC) on board numerous oceangoing vessels, including tank vessels similar in design, size and function to M/T RIDGEBURY ALEXANDRA Z.

As an Instructor at the Texas Maritime Academy, the undersigned prepared Merchant Marine Cadets for United States Coast Guard licensing and certification, including lessons and practical guidance regarding vessel operations; various crew responsibilities and ethics; and compliance with international regulations, including specifically for MARPOL regulations.

As a Marine Surveyor/Consultant, the undersigned has frequently attended on board vessels for incidents and casualties, including investigations of alleged improper oil monitoring equipment, and alleged pollution control equipment bypass and/or malfunction issues. In addition, the undersigned was employed for several years as a Pollution & Safety Advisor, with direct responsibility to ensure compliance of chartered vessels with United States domestic regulations, international treaties, and industry recommended customs and practices.

Consequently, the undersigned is very familiar with the issues of this matter and reports as follows:

United States Coast Guard – Marine Safety Laboratory Report

After review of the United States Coast Guard – Marine Safety Laboratory Report, we note that all tested samples were obtained from tanks and/or locations that would be expected to contain petroleum residues during the ordinary and normal course of operations.

Consequently, the detailed presence of oil and/or oil residues at all these locations was neither surprising nor an indication of an improper condition.

However, we note that the analysis report does detail that there were different characteristics for the Engine Room Bilge, Sludge and Waste Oil location samples, compared to the cargo system and Slop Tank transfer piping samples, and the samples *"are not derived from a common source of petroleum oil."*

United States Coast Guard – Marine Safety Unit Lake Charles Referral

We noted multiple inaccuracies within the United States Coast Guard – Marine Safety Unit Lake Charles Referral, specifically with respect to the operation and arrangements of the ODME fitted on board M/T RIDGEBURY ALEXANDRA Z.

ODME Manual and 2017 Records

The undersigned reviewed the Operations Manual and 2017 ODME operational records.

We are prepared to testify regarding the design arrangement and function of the Oilcon Mark 6M ODME, as well as the apparent function of the unit during the various uses in 2017 with regards to flow rate, discharge rate, ppm calculation, alarm functions, etc. It is apparent to the undersigned that the M/T RIDGEBURY ALEXANDRA Z was not operating correctly during any of the detailed operations carried out in 2017.

We note the discussion within the various statements regarding the alleged illegality of the "Manual Operation" mode for the ODME on board M/T RIDGEBRY ALEXANDRA Z. However, these allegations are incorrect. In accordance with international treaties, and vessel Flag State requirements, it is allowable to operate an ODME in "manual" mode.

These procedures and requirements are clearly detailed within the applicable Republic of the Marshall Islands Marine Notice No. 2-013-1, dated March 2016.

However, we note that the Chief Officer's Statement indicates that he did not operate the ODME in manual mode. Therefore, there would have been no reason or requirement for the crew to utilize the allowable procedures for manual operation.

Transfer of Oil/Oily Waste/Bilge Water from Engine Spaces to Slop Tank

The undersigned reviewed the allegation regarding the transfer of Engine Room waste water to the Slop Tank, through the fitted on-deck piping.

What must be understood, is that it is the Chief Engineer, not the Master or Chief Officer, that is responsible for the proper collection, holding and disposal of Engine Room wastewater, including bilge collections.

The Engine Room is equipped with an Oily Water Separator (OWS) specifically designed for the purpose.

Note: An OWS utilized for engine spaces is substantially different, both in design and function, compared to an ODME. An OWS is primarily monitoring PPM concentration of effluent, while an ODME is primarily designed for monitoring quantity of effluent discharged per nautical mile, and in aggregate.

The Chief Engineer is also tasked with completion of the Oil Record Book Part I entries for all Engine Room wastewater activities. A vessel's Master is expected to "countersign" the daily pages of the Oil Record Book, the Master is not required to observe or supervise the operation, nor attest to the accuracy of the entries.

Under normal operating circumstances, it not allowable to transfer wastewater from the Engine Room to the Cargo Slop Tank. However, under unusual circumstances, such as a lack of holding capacity resulting from an excessive leak/spill, or due to a malfunction of the OWS, it is allowable on a Tank vessel to transfer Engine Room wastewater to the cargo slop tank for safety purposes. Such an operation is required to be recorded in both the Oil Record Book Sections, Part I and Part II.

However, for product tankers (clean oil) such as M/T RIDGEBURY ALEXANDRA Z, any transfer of Engine Room wastewater would be highly problematic, as it would potentially create considerable difficulty subsequently cleaning the Slop Tank if any Fuel Oil or Sludge (black oil) was to enter the cargo system.

With regards to this matter, it is apparent that if indeed there was a transfer of wastewater, oil, etc., from the Engine Room to the Port Slop Tank, on, or about, July 2017, such would have been carried as a “convenience” for the Engine Department personnel, and not due to any emergency/safety condition; or any benefit to the Deck Department or vessel command, i.e. Captain Birzakovs.

Relationships/Responsibilities Between Master and Department Heads

A modern Merchant Marine Vessel is divided in to three separate and distinct on-board departments.

The Deck Department Head is the Chief Officer (also referred to as Chief Mate). On a Tanker, the Chief Officer is responsible for all cargo related activities, including loading, discharging, cleaning, decanting slops, etc. This principle is confirmed within the Statement of Chief Officer Prokhoda, and well detailed in texts such as the United States Coast Guard – recognized reference, *Towards Safer Ships & Cleaner Seas – A handbook for modern tankship operations*. The Chief Officer is also considered to be the 2nd in Command on board a vessel.

While certainly a Master should assist a Chief Officer whenever requested or when necessary, there is no expectation nor requirement that a Master will directly supervise a Chief Officer during the performance of his work.

Indeed, we note that the Chief Officer and Pumpman’s alleged use of a ship service water hose to replace/bypass the ODME sampling pipe would not have been visible to the Master at his normal and customary work locations, i.e. his office (cabin), or the Navigation Bridge.

The Engine Department Head is the Chief Engineer. As detailed previously, it is the Chief Engineer, not the Master nor Chief Officer, that is directly responsible for all Engine Room wastes, piping, valves, etc.

Typically, a Master will only have limited knowledge regarding the inner workings of the Engine Room spaces, and, indeed, would only have very limited authority regarding the engineering operations

The Stewards Department Head is the Chief Steward. The Stewards Department may only consist of two or three individuals. However, it is the Chief Steward that is responsible for the cleanliness of the Galley, and the various food safety principles inherent to the operations.

There is no requirement no expectation that a Master would directly supervise the food preparation or pantries on a day-to-day basis.

The Master (Captain) is the equivalent of a General Manager or Chief Executive on a vessel. In general, the only operation of a vessel that is directly supervised by the Master is the navigation, maneuvering and pilotage of the vessel. Otherwise, the Master is responsible for all the various statutory documents/paperwork, communications, crew pay, etc.

In addition, while generally responsible for evaluating the overall general job performance of the various Department Heads, the Master of a Merchant Marine Vessel does not, and cannot, directly supervise the day-to-day operations and job performance of each of these positions with regards to MARPOL responsibilities.

Each Department Head is required to follow the requirements of MARPOL and Flag State pollution regulations that are applicable to their operations. Indeed, it is apparent that the crew of M/T RIDGEBURY ALEXANDRA Z, under the command of Captain Birzakovs, were aware of the relevant MARPOL regulations, however the Chief Officer and Chief Engineer reportedly failed to comply with the MARPOL regulations,

In addition to the above, we also refer to the Chief Officer and Chief Engineer's responsibilities for completing the Oil Record Book, as detailed within numerous texts, including the frequently utilized INTERTANKO publication*, A Guide for Correct Entries in the Oil Record Book* (*Part I* and *Part II*).

Our investigation and review of the documents associated with this matter is ongoing. We reserve the right to amend or supplement this opinion should further information be made available.

e. & o. e. Without prejudice,

Capt. Marc A. Fazioli
3D MARINE USA, INC.

Enclosures:
1) Republic of the Marshall Islands Marine Notice No. 2-013-1
2) Excerpts from *Towards Safer Ships & Cleaner Seas*
3) Excerpts from *A Guide for Correct Entries in the Oil Record Book*
4) CV and Details for Captain Marc Fazioli

1) Republic of the Marshall Islands Marine Notice No. 2-013-1

**REPUBLIC OF**
**THE MARSHALL ISLANDS**

**MARITIME ADMINISTRATOR**

**Marine Notice**

**No. 2-013-1**

**Rev. 03/16**

---

**TO:** **ALL SHIPOWNERS, OPERATORS, MASTERS AND OFFICERS OF MERCHANT SHIPS, AND RECOGNIZED ORGANIZATIONS**

**SUBJECT:** **Oil Discharge Monitoring and Control Systems (ODMCS) Failures – Manual Means of Monitoring and Procedures for Discharge.**

**References:**

**(a)** **MARPOL**, *International Convention for the Prevention of Pollution from Ships, Consolidated Edition 2011*, as amended

**(b)** **IMO Resolution** **A.586(14)**, *Revised guidelines and specifications for oil discharge, monitoring and control systems for oil tankers*, adopted 20 November 1985

**(c)** **IMO Resolution** **MEPC.108(49)**, *Revised guidelines and specifications for oil discharge monitoring and control systems for oil tankers*, adopted 18 Jul 2003, as amended by **IMO Resolution** **MEPC.240(65)**, *2013 Amendments to the revised guidelines and specifications for oil discharge monitoring and control systems for oil tankers*, adopted 17 May 2013

**(d)** **IMO Report** **MEPC 36/22**, *Paragraph 9.40: Defective OMDC*, dated 22 November 1994

## PURPOSE:

This Notice provides procedures to be followed in the event of an ODMCS failure. This Notice supersedes Rev. 12/08, incorporates the latest IMO amendments on the subject, and includes consequential changes in various sections of the Notice.

## APPLICABILITY:

This Notice applies, in particular, to ship's Master and officers.

## REQUIREMENTS:

### 1.0 Manual Means of Monitoring Discharge

1.1 MARPOL Regulation I/31, details the requirements for the automated use of the oil discharge monitor with slop tanks during the cleaning operation of cargo tanks of existing tankers. Provisions must also be made for emergency manual control of the effluent discharge in case of failure of the ODMCS. IMO Resolution MEPC.108(49), as amended, contains the full revised guidelines and specifications for oil discharge monitoring and



**Inquiries concerning the subject of this Notice should be directed to the Maritime Administrator, Republic of the Marshall Islands, c/o Marshall Islands Maritime and Corporate Administrators, Inc., 11495 Commerce Park Drive, Reston, VA 20191-1506 USA. The most current version of all Republic of the Marshall Islands Marine Notices may be found at www.register-iri.com.**

MI-01, Rev. 10/14

control systems for oil tankers constructed on or after 01 January 2005, including the 2013 amendments set forth in MEPC.240(65). For tankers constructed prior to 2005, the equipment and systems may comply with the earlier standards contained in IMO Assembly Resolution A.586(14).

1.2 MARPOL Regulation I/31.2 states:

"Any failure of this monitoring and control system shall (automatically) stop the discharge. In the event of failure of the oil discharge monitoring and control system, a manually operated alternative method may be used, but the defective unit shall be made operable as soon as possible. Subject to allowance by the port State authority, a tanker with a defective oil discharge monitoring and control system may undertake one ballast voyage before proceeding to a repair port."

Further, per MARPOL Regulation I/36.6, all failures of the oil discharge monitoring and control system shall be noted in Part II of the Oil Record Book. Section 6.11.1.1 of Resolution MEPC.108(49), as amended, clarifies these reporting requirements to ensure complete and proper reporting of any such instances.

1.3 Per Report MEPC 36/22, paragraph 9.40, the phrase "before proceeding to a repair port" means a laden voyage following a ballast voyage. If the ODMCS fails during tank cleaning while the tanker is en route to a loading port, the cleaning may continue as long as a planned and documented manual method of monitoring and logging the discharge is being utilized. The vessel may then make one (1) loaded voyage after which the ODMCS must be repaired at the discharge port. If the repairs cannot be done at the discharge port, then the vessel may be allowed one (1) voyage directly to a port where ODMCS repairs can be accomplished.

1.4 Further, per MEPC 36/22, paragraph 9.40, such a voyage should only be acceptable under the following conditions:

.1 an oil discharge monitoring method must be manually operable;

.2 the vessel must provide documentary records in the Log Book or the Oil Record Book or in the vessel's planned maintenance record that the system has been maintained in accordance with the manufacturer's recommendations;

.3 the equipment has been utilized and records are available which verify the use of the unit during all ballast discharges prior to the present functional defect and that this defect has been duly recorded in the Oil Record Book;

.4 prior to arrival at the unloading port, the failure has been reported to the authorities (port State and classification society); and

.5 that every reasonable effort has been made to repair the defective unit prior to the vessel departing from the unloading port.

## 2.0 Manual Monitoring Procedures

2.1 The manual monitoring of the effluent discharge must be made during daylight hours using the oil/water interface detectors (MARPOL Regulation I/32) as well as following the ODMCS manufacturers instructions for manual operation (MARPOL Regulation I/31.4) together with the procedure recommended by MEPC.108(49), as amended, as follows:

.1 **oil content meter or sampling system:** location and measurement of the oil/water interface using the equipment as required in MARPOL Regulation I/32, visual observation of the surface of the water adjacent to the effluent discharge and recording the relevant data in the Oil Record Book Part II in sections H and I;

.2 **flow meter:** pump discharge characteristics such as the gallons or liters per minute to be considered in the calculation and recorded to check accuracy of flow meter;

.3 **ships speed device:** main engine revolutions per minute as well as the propeller diameter, pitch and slip to confirm ship travel in nautical miles to be recorded;

.4 **processor:** manual calculation and manual recording of oil content vs. water outflow to confirm total out flow; and

.5 **overboard discharge control:** manual operation of pumps and valves to be utilized together with all the above to confirm that an instantaneous rate of discharge of oil does not exceed 30 liters per nautical mile.

2.2 Upon failure of the ODMCS, discharge of effluent into the sea via the ODMCS must stop, and an entry must be made in the Oil Record Book.

2.3 At the time of ODMCS failure, the port State of destination, the Classification Society and this Administration must be immediately notified via fax, email or telephone. The vessel’s owners/operators should also be notified at this time and immediate measures taken to have the ODMCS repaired by a qualified service engineer.

2) Excerpts from *Towards Safer Ships & Cleaner Seas*

# Towards Safer Ships & Cleaner Seas

A handbook for modern tankship operations



GARD

competence or in removing those who prove incompetent. Since he will be held culpable for any default or omission by any member of his crew, it is in his own best interests to give his closest attention to improving crew competence.

### 1.1.5 Responsibilities

An officer can strictly perform all of the duties enumerated for him by the IMO, flag state regulations, and company policies without attaining a level of true professionalism. The various lists of duties constitute the *minimum* performance expected of any officer. True achievement as a seafaring professional is shown by the degree to which an officer exceeds the minimum requirements. A professional officer develops habits and practices which minimise errors in his own work and maximises the cooperation he gives and receives in working with the other officers and crew of his ship. He becomes aware of the limitations of his shipmates, but uses this knowledge to find ways to support them rather than criticise. He becomes familiar with the various bridge watch modes and strives to achieve proficiency in his role as a watch team member.

A professional officer ensures that the personnel on his watch are vigilant and attentive to their duties. He involves them in the planning and execution of the voyage or cargo plan. Above all he checks and re-checks the safety of those situations which expose the crew or the ship to danger. A navigation fix determined by two lines of position is not good enough for his watch, nor is an hourly tour of the deck sufficient during his cargo watch on a non-automated tanker.

The watch officer is always aware that while in charge, the safety of the vessel is entirely in his hands.

### 1.1.6 Obligations

Along with the trust of being a ship's officer come certain obligations. Many of these are 'moral obligations', not found on any list of standing orders. In fact, these responsibilities belong more in the category of 'ethics' than duties.

An officer has an obligation to see that his shipmates are fairly treated. This may include dealing forcefully with incompetence by one crew member in order to protect others from harm. It means treating the crew like fellow professionals, insuring that they are properly trained and informed regarding their duties. It means cooperating with other officers and the master. A true professional is able to work

with almost any man he sails with because his professionalism places getting the job done ahead of any personal feelings he has about his shipmates.

An officer has an obligation to the company employing him to see that their resources are used as efficiently as possible. While the master is principally responsible for protecting the interests of the owners, every officer should feel obliged to insure that the ship is operated with minimum waste, loss and exposure to the owners.

Protection of the environment is rapidly gaining as a primary duty and responsibility of the ship's crew. But even when operating within the letter of environmental regulation there are opportunities (for the chief officer in particular), to minimise the environmental impact the ship's operations have on the seas. It is a crew obligation to take advantage of those opportunities. Major oil spill incidents gather most publicity, but they contribute the minor part of marine pollution. The major part is due to operational pollution – where conscientious effort can make the greatest effect.

It is the obligation of the seaman to bring a professional attitude to his job. It is likewise the obligation of management to treat their crew as valued professionals. Such an attitude of mutual respect may go against the residue of years of union/management acrimony. The convincing evidence for such a change is the success of the shipping companies who have pursued a policy of mutual respect between ship and office. No matter how good the technology, in the end it all comes down to people.

If more evidence were needed of the importance of tanker crews, it could be found in such studies as the Norwegian *Cause relationships of collisions and groundings*, which found that only 6.8% of the 3000 incidents examined were due to technical failures. 93.2% were due to crew error.

Quoting from a book which was long the standard of this industry: "It may be that men will pose greater problems in the next decade than will machines and it is well to remember that a tanker fleet – or any fleet – no matter how good its ships, operates only as efficiently as the men who man it."[1]

## 1.2 SPECIAL DUTIES OF THE CHIEF OFFICER

The chief officer is required to demonstrate a higher level of training, experience and competence than the junior deck officers. The examination requirements for the license are more numerous and

[1] King, GAB, *Tanker Practice*, Fifth Edition, The Maritime Press Limited, 1968.

competence or in removing those who prove incompetent. Since he will be held culpable for any default or omission by any member of his crew, it is in his own best interests to give his closest attention to improving crew competence.

### 1.1.5 Responsibilities

An officer can strictly perform all of the duties enumerated for him by the IMO, flag state regulations, and company policies without attaining a level of true professionalism. The various lists of duties constitute the *minimum* performance expected of any officer. True achievement as a seafaring professional is shown by the degree to which an officer exceeds the minimum requirements. A professional officer develops habits and practices which minimise errors in his own work and maximises the cooperation he gives and receives in working with the other officers and crew of his ship. He becomes aware of the limitations of his shipmates, but uses this knowledge to find ways to support them rather than criticise. He becomes familiar with the various bridge watch modes and strives to achieve proficiency in his role as a watch team member.

A professional officer ensures that the personnel on his watch are vigilant and attentive to their duties. He involves them in the planning and execution of the voyage or cargo plan. Above all he checks and re-checks the safety of those situations which expose the crew or the ship to danger. A navigation fix determined by two lines of position is not good enough for his watch, nor is an hourly tour of the deck sufficient during his cargo watch on a non-automated tanker.

The watch officer is always aware that while in charge, the safety of the vessel is entirely in his hands.

### 1.1.6 Obligations

Along with the trust of being a ship's officer come certain obligations. Many of these are 'moral obligations', not found on any list of standing orders. In fact, these responsibilities belong more in the category of 'ethics' than duties.

An officer has an obligation to see that his shipmates are fairly treated. This may include dealing forcefully with incompetence by one crew member in order to protect others from harm. It means treating the crew like fellow professionals, insuring that they are properly trained and informed regarding their duties. It means cooperating with other officers and the master. A true professional is able to work

Case 2:18-cr-00335-JCZ-KK Document 56-6 Filed 05/03/19 Page 15 of 50 PageID #: 432

with almost any man he sails with because his professionalism places getting the job done ahead of any personal feelings he has about his shipmates.

An officer has an obligation to the company employing him to see that their resources are used as efficiently as possible. While the master is principally responsible for protecting the interests of the owners, every officer should feel obliged to insure that the ship is operated with minimum waste, loss and exposure to the owners.

Protection of the environment is rapidly gaining as a primary duty and responsibility of the ship's crew. But even when operating within the letter of environmental regulation there are opportunities (for the chief officer in particular), to minimise the environmental impact the ship's operations have on the seas. It is a crew obligation to take advantage of those opportunities. Major oil spill incidents gather most publicity, but they contribute the minor part of marine pollution. The major part is due to operational pollution – where conscientious effort can make the greatest effect.

It is the obligation of the seaman to bring a professional attitude to his job. It is likewise the obligation of management to treat their crew as valued professionals. Such an attitude of mutual respect may go against the residue of years of union/management acrimony. The convincing evidence for such a change is the success of the shipping companies who have pursued a policy of mutual respect between ship and office. No matter how good the technology, in the end it all comes down to people.

If more evidence were needed of the importance of tanker crews, it could be found in such studies as the Norwegian *Cause relationships of collisions and groundings*, which found that only 6.8% of the 3000 incidents examined were due to technical failures. 93.2% were due to crew error.

Quoting from a book which was long the standard of this industry: "It may be that men will pose greater problems in the next decade than will machines and it is well to remember that a tanker fleet – or any fleet – no matter how good its ships, operates only as efficiently as the men who man it." [1]

## 1.2 SPECIAL DUTIES OF THE CHIEF OFFICER

The chief officer is required to demonstrate a higher level of training, experience and competence than the junior deck officers. The examination requirements for the license are more numerous and

[1] King, GAB, *Tanker Practice*, Fifth Edition, The Maritime Press Limited, 1968.

detailed and the list of duties which his added knowledge must address is considerably longer. Some have described the job as a purgatory to be endured in order to merit the paradise of command at some future time. For the professional officer who is dedicated to his job, this should not be the case. It can be a time of strong professional development and great personal satisfaction. But the chief officer can certainly count on getting less sleep than he did as a second or third officer!

### 1.2.1 Cargo duties

The most demanding responsibility of the chief officer is oversight of all cargo operations. This includes cargo planning, tank preparation, loading, care, discharging, measurement, sampling and reporting responsibilities. Plans prepared for loading cargo are reviewed with the master to insure fullest compliance with company policies and best use of the particular arrangements of the ship's tanks, pumps and pipelines. Tank preparation procedures should be carefully planned with the help of the pumpman. The pumpman will, in many cases, have more experience on the ship than the chief officer. Full, written instructions for all loading, discharging and sampling operations must be prepared and carefully discussed with the junior officers. As each junior officer assumes his cargo watch, he should be closely questioned by the chief officer to verify that he fully understands what is required of him for the next four to six hours. Of course, the most important thing that is required of any junior officer is that he calls the chief officer whenever he is in doubt!

Despite the assistance available to him in each area of his duties, the chief officer remains the person responsible for the safe carriage of the cargo. He must develop the ability to know when and where his personal attention is needed to ensure safe cargo operations, so that he is both available when needed *and* sufficiently rested throughout. With some product values as high as $10 per US gallon, this is a considerable burden. In most cases, it means that the chief officer must remain on board throughout the loading or discharging operation. If he needs to go ashore during any cargo operation, the chief officer must advise the master of his intentions and ensure that the master will remain on board until he returns.

### 1.2.2 Maintenance

Part of the cargo responsibilities of the chief officer is maintenance of

detailed and the list of duties which his added knowledge must address is considerably longer. Some have described the job as a purgatory to be endured in order to merit the paradise of command at some future time. For the professional officer who is dedicated to his job, this should not be the case. It can be a time of strong professional development and great personal satisfaction. But the chief officer can certainly count on getting less sleep than he did as a second or third officer!

### 1.2.1 Cargo duties

The most demanding responsibility of the chief officer is oversight of all cargo operations. This includes cargo planning, tank preparation, loading, care, discharging, measurement, sampling and reporting responsibilities. Plans prepared for loading cargo are reviewed with the master to insure fullest compliance with company policies and best use of the particular arrangements of the ship's tanks, pumps and pipelines. Tank preparation procedures should be carefully planned with the help of the pumpman. The pumpman will, in many cases, have more experience on the ship than the chief officer. Full, written instructions for all loading, discharging and sampling operations must be prepared and carefully discussed with the junior officers. As each junior officer assumes his cargo watch, he should be closely questioned by the chief officer to verify that he fully understands what is required of him for the next four to six hours. Of course, the most important thing that is required of any junior officer is that he calls the chief officer whenever he is in doubt!

Despite the assistance available to him in each area of his duties, the chief officer remains the person responsible for the safe carriage of the cargo. He must develop the ability to know when and where his personal attention is needed to ensure safe cargo operations, so that he is both available when needed *and* sufficiently rested throughout. With some product values as high as $10 per US gallon, this is a considerable burden. In most cases, it means that the chief officer must remain on board throughout the loading or discharging operation. If he needs to go ashore during any cargo operation, the chief officer must advise the master of his intentions and ensure that the master will remain on board until he returns.

### 1.2.2 Maintenance

Part of the cargo responsibilities of the chief officer is maintenance of

3) Excerpts from *A Guide for Correct Entries in the Oil Record Book*

INTERTANKO

# A Guide for Correct Entries in the Oil Record Book (Part II – Cargo/ballast operations)

1st Edition

March 2014

# CONTENTS


1. PROLOGUE 6

2. INTRODUCTION 7

2.1 Scope of the Guide 7
2.2 ●bjective of the Guide 7
2.3 Content of the Guide 7

3. GENERAL REQUIREMENTS AND INSTRUCTIONS 8

4. ITEMS TO BE RECORDED 10

A. Loading of oil cargo 10
B. Internal transfer of oil cargo during voyage 10
C. Unloading of oil cargo 10
D. Crude oil washing (COW tankers only) 10
E. Ballasting of cargo tanks 11
F. Ballasting of dedicated clean ballast tanks (CBT tankers only) 11
G. Cleaning of cargo tanks 12
H. Discharge of dirty ballast 12
I. Discharge of water from slop tanks into the sea 13
J. Collection, transfer and disposal of residues and oily mixtures not otherwise dealt with 13
K. Discharge of clean ballast contained in cargo tanks 14
L. Discharge of ballast from dedicated clean ballast tanks (CBT tankers only) 14
M. Condition of oil discharge monitoring and control system 15
N. Accidental or other exceptional discharges of oil 15
O. Additional operational procedures and general remarks 15

TANKERS ENGAGED IN SPECIFIC TRADES 15

P. Loading of ballast water 15
Q. Re-allocation of ballast water within the ship 15
R. Ballast water discharge to reception facility 15

# 5. EXAMPLES FOR CARGO/BALLAST OPERATIONS 16


| | | |
|---|---|---|
| Example 1: | Loading of oil cargo – one loading port | 17 |
| Example 2: | Loading of oil cargo – multiple loading ports | 17 |
| Example 3: | Unloading of oil cargo – one discharge port | 18 |
| Example 4: | Unloading of oil cargo – multiple discharge ports | 18 |
| Example 5: | Internal transfer of oil cargo during voyage | 18 |
| Example 6: | Crude oil washing | 19 |
| Example 7: | Ballasting of cargo tanks | 20 |
| Example 8: | Discharge of dirty ballast into the sea | 21 |
| Example 9: | Cleaning of cargo tanks (transfer of tank washings to slop tanks) | 22 |
| Example 10: | Discharge of water from slop tank(s) into the sea | 22 |
| Example 11: | Discharge of clean ballast contained in cargo tank(s) | 24 |
| Example 12: | Disposal of slops to port reception facilities | 25 |
| Example 13: | Transfer (disposal) of sludge from engine room oil residue (sludge) tank(s) to slop tank(s) | 25 |
| Example 14: | Transfer (disposal) of bilge water from engine room oily bilge water holding tank(s) to slop tank(s) | 26 |
| Example 15a: | ODME failure | 27 |
| Example 15b: | Rectification of ODME failure | 27 |
| Example 16: | Missed operational entry | 28 |
| Example 17: | Pre-discharge pressure/leakage test of the COW piping system | 28 |

# 3. GENERAL REQUIREMENTS AND INSTRUCTIONS

- An ORB Part II shall be provided and maintained on every oil tanker of 150GT at all times.

- The ORB shall be properly completed. All cargo/ballast operations shall be clearly and accurately recorded as required.

- When making entries in the ORB Part II, the date, operational Code and item number shall be inserted in the appropriate columns and the required particulars shall be recorded chronologically in the blank lines as they have been executed on board.

- The entries in the ORB Part II shall be made in English, French or Spanish. Where entries in an official national language of the State whose flag the ship is entitled to fly are also used, this shall prevail in case of a dispute or discrepancy.

- All entries in the ORB Part II relevant to a specific completed operation shall be signed for and dated by the officer or officers in charge of the operation concerned and each completed page shall be signed by the Master of the ship.

- Dates shall be entered in the ORB Part II in dd-MONTH-yyyy format, e.g., 16-MAR-2011.

- Upon completion of each operation the proper entries shall be fully recorded without delay.

- Cargo tanks' nomenclature should be recorded as per the format noted within the vessel's Capacity Plan and as indicated, and graphically recorded, in the "PLAN VIEW OF CARGO AND SLOP TANKS" in the first page of the ORB Part II. In addition, the following should be noted:

    - The sum of the volumes stated in the column "capacity" must be the same as that stated in item "1.5 Carrying capacity of ship" of the Supplement of the International Oil Pollution Prevention Certificate (IOPPC) (Form B).

    - If the ship is not fitted with a pump room, a relevant entry should be made in the plan view.

    - The depth of the slop tanks should be obtained from the approved capacity/ullage tables of the vessel.

- Although not a legal requirement, and to assist with clarity of records, all entries in the ORB Part II should be recorded in CAPITAL LETTERS with indelible ink.

- If a wrong entry has been recorded in the ORB Part II, it should immediately be struck through with a single line in such a way that the wrong entry is still legible. The wrong entry should be signed and dated, with the new, corrected entry following.

- Empty or blank lines must not be left between successive entries in the ORB Part II.
- The ORB Part II shall be kept on board and must be readily available for inspection. It shall be preserved for a minimum period of three years after the last entry has been made.
- The Flag State administration as well as the Port State control authorities may inspect the ORB Part II on board any ship in its ports or offshore terminals and may make a copy of any entry in the ORB Part II, and may require the Master to certify that the copy is a true copy of such entry.
- Any copy so made which has been certified by the Master of the ship as a true copy of an entry in the ORB Part II shall be made admissible in any juridical proceedings as evidence of the facts stated in the entry.

# 4. ITEMS TO BE RECORDED

## A. Loading of oil cargo

1. Place of loading.

2. Type of oil loaded and identity of tank(s).

3. Total quantity of oil loaded (state quantity added, in $m^3$ at 15°C and the total content of tank(s), in $m^3$).

## B. Internal transfer of oil cargo during voyage

4. Identity of tank(s):

   .1 from:
   .2 to: (state quantity transferred and total quantity of tank(s), in $m^3$).

5. Was (were) the tank(s) in 4.1 emptied? (If not, state quantity retained, in $m^3$.)

## C. Unloading of oil cargo

6. Place of unloading.

7. Identity of tank(s) unloaded.

8. Was (were) the tank(s) emptied? (If not, state quantity retained, in $m^3$.)

## D. Crude oil washing (COW tankers only)

*(To be completed for each tank being crude oil washed)*

9. Port where crude oil washing was carried out or ship's position if carried out between two discharge ports.

10. Identity of tank(s) washed.

11. Number of machines in use.

12. Time of start of washing.

1 When an individual tank has more machines than can be operated simultaneously, as described in the Operations and Equipment Manual, then the section being crude oil washed should be identified, e.g. No.2 centre, forward section

13. Washing pattern employed.[2]

14. Washing line pressure.

15. Time washing was completed or stopped.

16. State method of establishing that tank(s) was (were) dry.

17. Remarks.[3]

## E. Ballasting of cargo tanks

18. Position of ship at start and end of ballasting.

19. Ballasting process:

 .1 identity of tank(s) ballasted;

 .2 time of start and end: and

 .3 quantity of ballast received. Indicate total quantity of ballast for each tank involved in operation, in $m^3$.

## F. Ballasting of dedicated clean ballast tanks (CBT tankers only)

20. Identity of tank(s) ballasted.

21. Position of ship when water intended for flushing, or port ballast was taken to dedicated clean ballast tank(s).

22. Position of ship when pump(s) and lines were flushed to slop tank.

23. Quantity of the oily water which, after line flushing, is transferred to the slop tank(s) or cargo tank(s) in which slop is preliminarily stored (identify tank(s)). State total quantity in $m^3$.

24. Position of ship when additional ballast water was taken to dedicated clean ballast tank(s).

25. Time and position of ship when valves separating the dedicated clean ballast tanks from cargo and stripping lines were closed.

26. Quantity of clean ballast taken on board, in $m^3$.

2 In accordance with the Operations and Equipment Manual, enter whether single-stage or multi-stage method of washing is employed. If multi-stage method is used, give the vertical arc covered by the machines and the number of times that arc is covered for that particular stage of the programme.

3 If the programmes given in the Operations and Equipment Manual are not followed, then the reasons must be given under Remarks.

## G. Cleaning of cargo tanks

27. Identity of tank(s) cleaned.

28. Port or ship's position.

29. Duration of cleaning.

30. Method of cleaning.[4]

31. Tank washings transferred to:

    .1 reception facilities (state port and quantity, in $m^3$)[5]; and

    .2 slop tank(s) or cargo tank(s) designated as slop tank(s) (identify tank(s); state quantity transferred and total quantity, in $m^3$).

## H. Discharge of dirty ballast

32. Identity of tank(s).

33. Time and position of ship at start of discharge into the sea.

34. Time and position of ship on completion of discharge into the sea.

35. Quantity discharged into the sea, in $m^3$.

36. Ship's speed(s) during discharge.

37. Was the discharge monitoring and control system in operation during the discharge?

38. Was a regular check kept on the effluent and the surface of the water in the locality of the discharge?

39. Quantity of oily water transferred to slop tank(s) (identify slop tank (s)). State total quantity, in $m^3$.

40. Discharged to shore reception facilities (identify port and quantity involved, in $m^3$).[5]

4 Hand-hosing, machine washing and/or chemical cleaning. Where chemically cleaned, the chemical concerned and amount used should be stated.

5 Ships' masters should obtain from the operator of the reception facilities, which include barges and tank trucks, a receipt or certificate detailing the quantity of tank washings, dirty ballast, residues or oily mixtures transferred together with the time and date of the transfer. This receipt or certificate, if attached to the Oil Record Book Part II, may aid the master of the ship in proving that his ship was not involved in an alleged pollution incident. The receipt or the certificate should be kept together with the Oil Record Book Part II.

## I. Discharge of water from slop tanks into the sea

41. Identity of slop tanks.
42. Time of settling from last entry of residues, or
43. Time of settling from last discharge.
44. Time and position of ship at start of discharge.
45. Ullage of total contents at start of discharge.
46. Ullage of oil/water interface at start of discharge.
47. Bulk quantity discharged, in $m^3$ and rate of discharge, in $m^3$/hour.
48. Final quantity discharged, in $m^3$ and rate of discharge, in $m^3$/hour.
49. Time and position of ship on completion of discharge.
50. Was the discharge monitoring and control system in operation during the discharge?
51. Ullage of oil/ water interface on completion of discharge, in metres.
52. Ship's speed(s) during discharge.
53. Was regular check kept on the effluent and the surface of water in the locality of the discharge?
54. Confirm that all applicable valves in the ship's piping system have been closed on completion of discharge from the slop tanks.

## J. Collection, transfer and disposal of residues and oily mixtures not otherwise dealt with

55. Identity of tanks.
56. Quantity transferred or disposed of from each tank (State the quantity retained, in $m^3$)
57. Method of transfer or disposal:

    .1 disposal to reception facilities (identify port and quantity involved).[5]

    .2 mixed with cargo (state quantity).

5 Ships' masters should obtain from the operator of the reception facilities, which include barges and tank trucks, a receipt or certificate detailing the quantity of tank washings, dirty ballast, residues or oily mixtures transferred together with the time and date of the transfer. This receipt or certificate, if attached to the Oil Record Book Part II, may aid the master of the ship in proving that his ship was not involved in an alleged pollution incident. The receipt or the certificate should be kept together with the Oil Record Book Part II.

.3 transferred to or from (an)other tank(s) including transfer from machinery space oil residue (sludge) and oily bilge water tanks (identify tank(s); state quantity transferred and total quantity in tank(s), in m³); and

.4 other method (state which); state quantity disposed of, in m³.

## K. Discharge of clean ballast contained in cargo tank(s)

58. Position of ship at start of clean ballast.

59. Identity of tank(s) discharged.

60. Was (were) the tank(s) empty on completion?

61. Position of ship on completion if different from 58.

62. Was a regular check kept on the effluent and the surface of the water in the locality of the discharge?

## L. Discharge of ballast from dedicated clean ballast tanks (CBT tankers only)

63. Identity of tank(s) discharged.

64. Time and position of ship at start of discharge of clean ballast into the sea.

65. Time and position of ship on completion of discharge into the sea.

66. Quantity discharged, in m³:

 .1 into the sea; or

 .2 to reception facility (identify port).[5]

67. Was there any indication of oil contamination of the ballast water before or during discharge into the sea?

68. Was the discharge monitored by an oil content meter?

69. Time and position of ship when valves separating dedicated clean ballast tanks from the cargo and stripping lines were closed on completion of deballasting.

5 Ships' masters should obtain from the operator of the reception facilities, which include barges and tank trucks, a receipt or certificate detailing the quantity of tank washings, dirty ballast, residues or oily mixtures transferred together with the time and date of the transfer. This receipt or certificate, if attached to the Oil Record Book Part II, may aid the master of the ship in proving that his ship was not involved in an alleged pollution incident. The receipt or the certificate should be kept together with the Oil Record Book Part II.

## M. Condition of oil discharge monitoring and control system

70. Time of system failure.

71. Time when system has been made operational.

72. Reasons for failure.

## N. Accidental or other exceptional discharges of oil

73. Time of occurrence.

74. Port or ship's position at time of occurrence.

75. Approximate quantity, in m³, and type of oil.

76. Circumstances of discharge or escape, the reasons therefore and general remarks.

## O. Additional operational procedures and general remarks

# TANKERS ENGAGED IN SPECIFIC TRADES

## P. Loading of ballast water

77. Identity of tank(s) ballasted.

78. Position of ship when ballasted.

79. Total quantity of ballast loaded in m³.

80. Remarks.

## Q. Re-allocation of ballast water within the ship

81. Reason for re-allocation.

## R. Ballast water discharge to reception facility

82. Port(s) where ballast water was discharged.

83. Name or designation of reception facility.

84. Total quantity of ballast water discharged in m³.

85. Date, signature and stamp of port authority official.

# 5. EXAMPLES FOR CARGO/BALLAST OPERATIONS


| | | |
|---|---|---|
| Example 1: | Loading of oil cargo – one loading port | 17 |
| Example 2: | Loading of oil cargo – multiple loading ports | 17 |
| Example 3: | Unloading of oil cargo – one discharge port | 18 |
| Example 4: | Unloading of oil cargo – multiple discharge ports | 18 |
| Example 5: | Internal transfer of oil cargo during voyage | 18 |
| Example 6: | Crude oil washing | 19 |
| Example 7: | Ballasting of cargo tanks | 20 |
| Example 8: | Discharge of dirty ballast | 21 |
| Example 9: | Cleaning of cargo tanks (transfer of tank washings to slop tanks) | 22 |
| Example 10: | Discharge of water from slop tank(s) into the sea | 22 |
| Example 11: | Discharge of clean ballast contained in cargo tank(s) | 24 |
| Example 12: | Disposal of slops to port reception facilities | 25 |
| Example 13: | Transfer (disposal) of sludge from engine room oil residue (sludge) tank(s) to slop tank(s) | 25 |
| Example 14: | Transfer (disposal) of bilge water from engine room oily bilge water holding tank(s) to slop tank(s) | 26 |
| Example 15a: | ODME failure | 27 |
| Example 15b: | Rectification of ODME failure | 27 |
| Example 16: | Missed operational entry | 28 |
| Example 17: | Pre-discharge pressure/leakage test of the COW piping system | 28 |

## Example 1: Loading of oil cargo – one loading port

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | A | 1 | ARZEW |
| | | 2 | CRUDE OIL – COTS NO 1, 2, 3, 4, 5, 6 (P & S), SLOP TK (P&S) |
| | | 3 | QUANTITY LOADED 165105 M$^3$ AT 15°C |
| | | | TOTAL CONTENT OF TANKS 165245 M$^3$ AT 15°C |
| | | | SIGNED (*OFFICER-IN-CHARGE, NAME & RANK*) 22-OCT-2013 |

**Notes:**
The quantities should be recorded in accordance with the ship's ullage report.

It should be noted that under A.3, the responsible officer should record both the "quantity of oil loaded" and the "total contents of tanks". Therefore, the following quantities should be recorded:

1. Quantity loaded: Total Calculated Volume (TCV) – On Board Quantity (OBQ)

2. Total contents of tank: Total Calculated Volume (TCV)

The type of oil loaded should be as per Appendix I "List of oils" to Annex I of MARPOL.

## Example 2: Loading of oil cargo – multiple loading ports

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-APR-2013 | A | 1 | RAS LAFFAN |
| | | 2 | CRUDE OIL – COTS NO. 2C, 4C, 5 (P & S), SLOP TK (P) |
| | | 3 | QUANTITY LOADED 81200 M$^3$ AT 15°C |
| | | | TOTAL CONTENT OF TANKS 81200 M$^3$ AT 15°C |
| | | | SIGNED: (*OFFICER-IN-CHARGE, NAME & RANK*) 22-APR-2013 |
| 24-APR-2013 | A | 1 | AL SHAHEEN |
| | | 2 | CRUDE OIL – COTS NO 1 (P&S), 3(P&S), 5C, SLOP TK (S) |
| | | 3 | QUANTITY LOADED 101645 M$^3$ AT 15°C |
| | | | TOTAL CONTENT OF TANKS 101645 M$^3$ AT 15°C |
| | | | SIGNED (*OFFICER-IN-CHARGE, NAME & RANK*) 24-APR-2013 |
| 26-APR-2013 | A | 1 | MINA AL AHMADI |
| | | 2 | CRUDE OIL – COTS NO 1C, 3C, 2(P&S), 4(P&S) |
| | | 3 | QUANTITY LOADED 132996 M3 AT 15°C |
| | | | TOTAL CONTENT OF TANKS 315814 M3 AT 15°C |
| | | | SIGNED: (*OFFICER-IN-CHARGE, NAME & RANK*) 26-APR-2013 |

**Notes:**
The same notes as per Example 1 apply.

# Example 3: Unloading of oil cargo – one discharge port

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | C | 6 | ROTTERDAM |
| | | 7 | COTS NO 1, 2, 3, 4, 5, 6 (P & S), SLOP TK (P&S) |
| | | 8 | YES |
| | | | SIGNED: (OFFICER-IN-CHARGE, NAME & RANK) 22-OCT-2013 |

# Example 4: Unloading of oil cargo – multiple discharge ports

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | C | 6 | SAKAI |
| | | 7 | COTS NO 1, 3, 5 (P & S), SLOP TK (P&S) |
| | | 8 | YES |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 22-OCT-2013 |
| 24-OCT-2013 | C | 6 | KAWASAKI |
| | | 7 | COTS NO 2, 4, 6 (P & S) |
| | | 8 | YES |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 24-OCT-2013 |

# Example 5: Internal transfer of oil cargo during voyage

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | B | 4.1 | FROM: COT NO.3 (C) |
| | | 4.2 | TO: COT NO.5 (C), 1600 M³ TRANSFERRED, TOTAL QUANTITY OF |
| | | | TANK: 28600M³ |
| | | 5 | NO – QUANTITY RETAINED: 24500 M³ |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 22-OCT-2013 |

# Example 6: Crude oil washing

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge | | | |
|---|---|---|---|---|---|---|
| 23-FEB-2013 | D | 9 | KAWASAKI | | | |
| | | 10 | COT NO.3C | COT NO.1C | COT NO.1P | COT NO.1S |
| | | 11 | 4 | 4 | 2 | 2 |
| | | 12 | 10 00 HRS | 10 35 HRS | 11 10 HRS | 11 10 HRS |
| | | 13 | MULTI STAGE | MULTI STAGE | MULTI STAGE | MULTI STAGE |
| | | | 2 PASS 50°-0°-50° | 2 PASS 50°-0°-50° | 2 PASS 50°-0°-50° | 2 PASS 50°-0°-50° |
| | | 14 | 8 KGF/CM² | 8 KGF/CM² | 8 KGF/CM² | 8 KGF/CM² |
| | | 15 | 10 30 HRS | 11 05 HRS | 11 30 HRS | 11 30 HRS |
| | | 16 | DIPPING WITH CLOSED TYPE SOUNDING ROD | | | |
| | | 17 | NONE | | | |
| | | | SIGNED *(OFFICER-IN-CHARGE, NAME & RANK)* 23-FEB-2013 | | | |

**Notes:**

To be completed for each tank being crude oil washed.

Enter ship's position under Code D, Item 9 as: LAT:... LONG.... , if COW operations carried out at sea.

Irrespective of the fact that COW is carried out at the last stage of the discharge operation, the Code C and Code D entries must be made and signed separately (first all the Code C entries followed by the Code D entries).

Pressure measurement may also be recorded using other recognised units, for example, MPa, Bar or lbs/ft².

# Example 7: Ballasting of cargo tanks

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | E | 18 | POSITION AT START: LAT: .... LONG: .... |
| | | | POSITION AT STOP: LAT: .... LONG: .... |
| | | 19.1 | COTS NO. 3(C) , 5(C) |
| | | 19.2 | START: 08:30 HRS, END: 14:40 HRS |
| | | 19.3 | 24500 $M^3$ IN NO.3(C), 23200 $M^3$ IN NO.5(C), |
| | | | SIGNED: (OFFICER-IN-CHARGE, NAME & RANK) 22-OCT-2013 |

**Notes:**

In accordance with MARPOL/Annex I/Reg. 18.3, **in no case shall ballast water be carried in cargo tanks, except**:

.1 on those rare voyages when **weather conditions are so severe** that, in the opinion of the Master, it is necessary to carry additional ballast water in cargo tanks for the safety of the ship; and

.2 **in exceptional cases** where the particular character of the operation of an oil tanker renders it necessary to carry ballast water in excess of the quantity required under para 2 of this regulation, provided that such operation of the oil tanker falls under the category of exceptional cases as established by the Organisation.

The above-mentioned "exceptional cases" are set out in MARPOL Annex I UI [32] and include the following cases:

1. When combination carriers are required to operate beneath loading or unloading gantries;
2. When tankers are required to pass under a low bridge;
3. When local port or canal regulations require specific draughts for safe navigation;
4. When loading and unloading arrangements require the tanker to be at a draught deeper than that achieved when all segregated ballast tanks are full;
5. Close-up inspection or/and steel thickness measurement using rafts where permitted by the rules; and
6. Tank hydrostatic pressure tests.

In accordance with MARPOL/Annex I/Reg. 18.4, the additional ballast permitted as above-mentioned in crude oil tankers shall be carried in cargo tanks only if such tanks have been crude oil washed, in accordance with regulation 35 of this Annex, before departure from an oil unloading port or terminal.

# Example 8: Discharge of dirty ballast into the sea

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-MAR-2013 | H | 32 | COT NO.4(C) |
| | | 33 | TIME: 17:00 HRS, POSITION: LAT: .... LONG: .... |
| | | 34 | TIME: 21:00 HRS, POSITION LAT: .... LONG: .... |
| | | 35 | 12100 $M^3$ |
| | | 36 | 12 KNOTS |
| | | 37 | YES |
| | | 38 | YES |
| | | 39 | 700 $M^3$ TRANSFERRED TO SLOP TK (P), TOTAL QUANTITY IN |
| | | | TANK: 800 $M^3$ |
| | | | SIGNED *(OFFICER-IN-CHARGE, NAME & RANK)* 22-MAR-2013 |

**Notes:**

The discharge of dirty ballast into the sea is allowed only when all the following conditions are satisfied:

.1 the tanker is not within a special area;

.2 the tanker is more than 50 nautical miles from the nearest land;

.3 the tanker is proceeding en route;

.4 the instantaneous rate of discharge of oil content does not exceed 30 litres per n.mile;

.5 the total quantity of oil discharged into the sea does not exceed 1/30,000 of the total quantity of the particular cargo of which the residue formed a part; and

.6 the tanker has in operation an ODMC.

The entries under code item H should be consistent with the ODMC records.

The ship speed recorded in 36 should correspond to the distance between the positions recorded under items 33 and 34 and the relevant time duration estimated from the same recordings.

For further guidance, refer to section 1.7 of the ICS/OCIMF "Clean Seas Guide for Oil Tankers".

# Example 9: Cleaning of cargo tanks (transfer of tank washings to slop tanks)

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-MAY-2013 | G | 27 | COTS NO 1 (C), 2(C) |
| | | 28 | LAT: . LONG .. |
| | | 29 | 5 HRS AND 50 MINUTES |
| | | 30 | FIXED COW MACHINE WASHING |
| | | 31.2 | 500 $M^3$ TRANSFERRED TO SLOP TK (P), TOTAL QUANTITY IN |
| | | | TANK: 520 $M^3$ |
| | | | SIGNED: (*OFFICER-IN-CHARGE, NAME & RANK*) 22-MAY-2013 |

**Notes:**

The ship's position to be recorded under item 28 is the position when the cleaning operation starts.

Where chemical cleaning is employed, the cleaning additive concerned and amount used should be stated under item 30.

# Example 10: Discharge of water from slop tank(s) into the sea

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | I | 41 | SLOP TK (P) |
| | | 42 | 36 HOURS |
| | | 44 | TIME: 13:00 HRS, POSITION LAT: .. LONG .. |
| | | 45 | 8.15 M |
| | | 46 | 11.05 M |
| | | 47 | 1730 $M^3$, 1000 $M^3$/H |
| | | 48 | 200 $M^3$, 150 $M^3$/H |
| | | 49 | TIME: 16:05 HRS, POSITION: LAT: . .. LONG .. |
| | | 50 | YES |
| | | 51 | 17.10 M |
| | | 52 | 14 KNOTS |
| | | 53 | YES |
| | | 54 | YES |
| | | | SIGNED: (*OFFICER-IN-CHARGE, NAME & RANK*) 22-OCT-2013 |

**Notes:**

The time of settling depends upon the motion of the ship as well as on the type of the previous cargo. Oil settling in slop tank for at least 36 hours should be carried out before discharge of any water from the slop tanks to the sea.

The item 43 is used **alternatively** to item 42 in cases when the discharge follows a previous discharge from the same tank without in the meantime new washings to have been added to the tank.

The discharge of water from slop tanks into the sea is allowed only when all the following conditions are satisfied:

.1 the tanker is not within a special area;

.2 the tanker is more than 50 nautical miles from the nearest land;

.3 the tanker is proceeding en route;

.4 the instantaneous rate of discharge of oil content does not exceed 30 litres per n.mile;

.5 the total quantity of oil discharged into the sea does not exceed 1/30,000 of the total quantity of the particular cargo of which the residue formed a part; and

.6 the tanker has in operation an ODMC.

Item 47 refers to "bulk quantity" and item 48 to "final quantity". As it is known the discharge of slop tanks should take place in two phases as follows:

Phase (a): during the first phase, the main or "bulk" part of water in the slop tank is discharged.

Phase (b): when the oil/water interface is coming close to the tank bottom, a lower discharge rate is employed, so as not to disturb the oil/water interface thus preventing any oily water discharging overboard.

Therefore the quantity and rate of discharge of Phase (a) is recorded in item 47 while in item 48 the details of Phase (b) should be recorded.

At least 1m sounding of water should be left at the bottom of the tank at the end of the discharge.

The entries under code item I should be consistent with the ODMC records.

The ship speed recorded in 52 should correspond to the distance between the positions recorded under items 44 and 49 and the relevant time duration estimated from the same recordings.

For further guidance refer to section 1.8 of the ICS/OCIMF "Clean Seas Guide for Oil Tankers".

# Example 11: Discharge of clean ballast contained in cargo tank(s)

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | K | 58 | LAT: .... LONG: .... |
| | | 59 | COTS NO. 3(C) , 5(C) |
| | | 60 | YES |
| | | 61 | LAT: .... LONG: .... |
| | | 62 | YES |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 22-OCT-2013 |

**Notes:**

In accordance with MARPOL/Annex I/Reg. 1.17, **Clean Ballast** is considered to be the ballast which is loaded in a tank which since oil was last carried therein, has been so cleaned that effluent therefrom if it were discharged from a ship which is stationary into clean calm water on a clear day would not produce visible traces of oil on the surface of the water or on adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines.

If the ballast is discharged through an oil discharge monitoring and control system approved by the Administration, evidence based on such a system to the effect that the oil content of the effluent did not exceed 15 parts per million shall be determinative that the ballast was clean, notwithstanding the presence of visible traces.

**Therefore, the Master could consider the ballast loaded in a cargo tank as "clean ballast" provided that COW (for a crude oil carrier) and thorough tank cleaning had been previously carried out to this tank. IT IS THE MASTER'S RESPONSIBILITY TO DETERMINE IF THE BALLAST IN A CARGO TANK IS "CLEAN BALLAST" DEPENDING ON THE EXTENT/THOROUGHNESS OF COW AND TANK CLEANING THAT HAS BEEN CARRIED OUT.**

MARPOL/Annex I/Regs. 34.2 and 34.4 do not prohibit the discharge of "Clean Ballast" at sea (even within a Special Area).

# Example 12: Disposal of slops to port reception facilities

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013 | J | 55 | SLOP TK (S) |
| | | 56 | 350 M³ DISPOSED, 0 M³ RETAINED IN TANK SLOP TK (S) |
| | | 57.1 | FUJAIRAH, 350 M³ DISPOSED TO "SLOPS BARGE II" RECEIPT |
| | | | NO. ..... |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 22-OCT-2013 |

**Notes:**

The Master should obtain from the operator of the reception facilities, which includes barges and tank trucks, a receipt or certificate detailing the quantity of the slops disposed, together with the time and date of the transfer. This receipt or certificate should be kept together with the ORB – Part II.

# Example 13: Transfer (disposal) of sludge from engine room oil residue (sludge) tank(s) to slop tank(s)

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 02-JAN-2013 | J | 55 | SLOP TK (S) |
| | | 56 | 15 M³ TRANSFERRED, 220 M³ RETAINED IN SLOP TK (S) |
| | | 57.3 | 15 M³ TRANSFERRED FROM MACHINERY SPACE WASTE OIL |
| | | | TANK (FR:21-26), 2 M³ RETAINED IN WASTE OIL TANK |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 02-JAN-2013 |

**Notes:**

Any arrangement provided for sludge transfer to slop tanks should incorporate adequate means to prevent any backflow of liquid cargo and gases into the machinery spaces.

For such an entry to be made, it should be explicitly stated in item 3.2.3 of the Supplement to the IOPPC that this method is allowed.

Prior to any such transfer the Company's agreement should be requested.

An entry in the ORB – Part I (Machinery space operations) must also be made using code C.12.4.

The identity of the oil residue (sludge) tank recorded in this example should be in strict compliance with section 3.1 of the supplement of the IOPPC.

# Example 14: Transfer (disposal) of bilge water from engine room oily bilge water holding tank(s) to slop tank(s)

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 20-OCT-2013 | J | 55 | SLOP TK (S) |
| | | 56 | 25 M³ TRANSFERRED, 245 M³ RETAINED IN SLOP TK (S) |
| | | 57.3 | 25 M³ TRANSFERRED FROM MACHINERY SPACE BILGE WATER |
| | | | HOLDING TANK (FR:11-19), 2 M³ RETAINED IN BILGE WATER |
| | | | HOLDING TANK |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 20-OCT-2013 |

**Notes:**

Any arrangement provided for machinery space oily bilge water transfer to slop tanks should incorporate adequate means to prevent any backflow of liquid cargo and gases into the machinery spaces.

For such an entry to be made, it should be explicitly stated in item 3.2.3 of the Supplement to the IOPPC that this method is allowed. (In such cases where a vessel has a waiver for oil filtering equipment (15ppm) under MARPOL Regulation 14, item 2.5.3 of the Supplement to the IOPPC may be applicable.)

Prior to any such transfer the Company's agreement should be requested.

An entry in the ORB – Part I (Machinery space operations) must also be made using code D.13/14/15.3.

The identity of the oily bilge water holding tank recorded in this example should be in strict compliance with item 3.3 of the supplement of the IOPPC. (In such cases where a vessel has a waiver for oil filtering equipment (15ppm) under MARPOL Regulation 14, the identity of the holding tank should comply with the Table of item 2.5.2 of the Supplement to the IOPPC.)

# Example 15a: ODME failure

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 20-MAR-2013 | M | 70 | 09:00 HRS |
| | | 71 | UNKNOWN – SPARE PARTS HAVE BEEN ORDERED *(if known, it should be recorded)* |
| | | 72 | FAILURE OF OPTICAL TRANSMITTER ELECTRONIC BOARD |
| | | | SIGNED: (OFFICER-IN-CHARGE, NAME & RANK) 20-MAR-2013 |

**Notes:**
On the date where the system is functional again, a new entry, using code M 70/71/72 should be made where M 70 is the date and time of the initial failure and 71 is the time the system is functional again (see below example).

# Example 15b: Rectification of ODME failure

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 25-MAY-2013 | M | 70 | 09:00 HRS, 20-MAR-2011 |
| | | 71 | 13:00 HRS |
| | | 72 | FAILURE OF OPTICAL TRANSMITTER ELECTRONIC BOARD |
| | | | SIGNED: (*OFFICER-IN-CHARGE, NAME & RANK*) 25-MAY-2013 |

**Notes:**
Under item 70, record the time and date when the failure occurred (same time and date as in example 15a).

## Example 16: Missed operational entry

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 22-OCT-2013[1] | O | | ENTRY PERTAINING TO AN EARLIER MISSED OPERATIONAL ENTRY |
| | | | |
| 29-OCT-2013[2] | J | 55 | SLOP TK (S) |
| | | 56 | 15 M³ TRANSFERRED, 220 M³ RETAINED IN SLOP TK (S) |
| | | 57.3 | 15 M³ TRANSFERRED FROM MACHINERY SPACE WASTE OIL TANK |
| | | | (FR:21-26), 2 M³ RETAINED IN WASTE OIL TANK |
| | | | SIGNED [1]: (OFFICER-IN-CHARGE, NAME & RANK) 29-OCT-2013 |
| | | | SIGNED [2]: (OFFICER-IN-CHARGE, NAME & RANK) 29-OCT-2013 |

**Notes:**

**This entry should be made only in exceptional cases**

Date [1] to be the date when the original operation was carried out.

Date [2] to be the current date i.e. the date when the entry is made.

Signed [1]: Signature of Officer making the "O" entry

Signed [2]: Signature of Officer making missed entry.

## Example 17: Pre-discharge pressure/leakage test of the COW piping system

| Date | Code (letter) | Item (number) | Record of operations/signature of officer in charge |
|---|---|---|---|
| 01-JUN-2013 | O | | COW PIPING SYSTEM WAS PRESSURE TESTED AT 8 KGF/CM² |
| | | | WITH SATISFACTORY RESULTS. NO LEAKAGE OCCURRED. |
| | | | SIGNED: *(OFFICER-IN-CHARGE, NAME & RANK)* 01-JUN-2013 |

**Notes:**

In accordance with paragraph 8.1 of the Guidelines for In-port Inspection of Crude Oil Washing Procedures (Part IV of the IMO PUBLICATION "IMO-IA617E" Crude Oil Washing Systems) it is required that the operational test for leakage (pressure test) of the COW piping before cargo discharge be recorded in the ship's Oil Record Book.

The test pressure to be recorded should be the COW working pressure as indicated in the ship's COW manual.

4) CV and Details for Captain Marc Fazioli

# CURRICULUM VITAE

| | | |
|---|---|---|
| Name | : | Marc A. Fazioli |
| Citizenship | : | United States of America |
| Office Address | : | 12411 Donna Dr., Houston, Texas 77067 |
| Qualifications | : | USCG issued Master's License w/ Radar Observer<br>STCW Certificate endorsed Tankerman (PIC)<br>FCC License - Marine Radio Operator / GMDSS Operator<br>OSHA Certification as Shipyard Competent Person |
| Education | : | BS - Marine Transportation<br>Texas A&M University |

## CAREER INFORMATION :

| | |
|---|---|
| 2007 - Present | 3D Marine USA, Inc., Houston, Texas<br>Marine Surveyor / Consultant |
| 2005 - 2007 | Chugach Development Corporation, Anchorage, Alaska<br>Master / Harbor Pilot |
| 2001 - 2005 | 3D Marine USA, Inc., Brownsville, Texas<br>Marine Surveyor / Consultant |
| 2001 - 2005 | Martech Unlimited, Inc. (Noble Denton Group), Beaumont, Texas<br>Pollution and Safety Advisor / Consultant |
| 1996 - 2001 | Maritime Overseas Corporation (OSG), New York, New York<br>Merchant Marine Officer |
| 1999 | Casino Padre Investment Company, South Padre Island, Texas<br>Master |
| 1995 - 1996 | Texas A&M University, Galveston, Texas<br>Lecturer, Department of Marine Transportation |
| 1994 - 1995 | Marine Transport Lines, Inc., Weehawken, New Jersey<br>Merchant Marine Officer |

## CAPTAIN MARC FAZIOLI

Captain Fazioli's thirty-four years of continuous experience in the maritime industry commenced in 1985 working as a sailing instructor at his family-owned recreational boat rental business in South Padre Island, Texas. Marc also worked as a Deckhand on Passenger/Fishing Vessels sailing from Port Isabel, Texas before pursuing a college degree and Merchant Marine License at the Texas Maritime Academy. After Ordinary Seaman and Cadet experience on Product Tankers and Container Ships with companies, including Coastal Tankships, Crest Tankers and Sea-Land Services, Marc graduated from Texas A&M University with a BS in Marine Transportation. His first Officer experience was with Marine Transport Lines on board Molten Sulphur Tankers. Marc then joined the Marine Transportation Department at Texas A&M University where he was responsible for instructing Cadets in Marine Safety, Lifesaving, Shiphandling and Seamanship. Marc returned to sea with Maritime Overseas Corporation (Overseas Shipholding Group) sailing as a Deck Officer on Crude Oil and Product Tankers, Geared Bulkers, and Ro/Ro vessels. During vacation periods from Maritime Overseas Corporation, Marc assisted in the start-up of an offshore gambling operation and served as Master of M/V ENTERTAINER during these periods. After coming ashore in 2001, Marc joined 3D Marine, assuming the duties as Manager of the Brownsville, Texas branch office.

In 2005, Marc accepted a position as Master with Chugach Development Corp. on U.S. Army-owned cargo and research vessels in support of Pacific-based missile launching activities. In addition to his duties as Master of first USAV GREAT BRIDGE and then USAV WORTHY, Marc also served on Towing Vessels (including ship assist), High Speed Catamarans and Small Passenger Vessels transiting the islands of Kwajalein Atoll.

Marc served as the Harbor Pilot for Government and Commercial vessels, including Research Vessels, Tankers, Container Ships and Tug/Barge Units, calling the Port of Kwajalein, RMI.

Marc has attended numerous training and certification courses since graduation from Texas A&M University. He has successfully completed all of the United States Coast Guard Management Level STCW courses including Advanced Navigation and Voyage Planning, Advanced Shiphandling, Stability, Meteorology, Bridge Resource Management, Watchkeeping, Cargo Operations, Shipboard Management, Marine Firefighting, Medical Care Provider, and Electronic Chart Display and Information Systems (ECDIS). Marc also completed courses on the operations of Mobile Offshore Drilling Units. Most recently, Marc received Classification Society certification as a Hatch Cover Inspector for Bulk Vessels and Certification as an Arbitrator from the Houston Maritime Arbitrators Association.

Captain Fazioli rejoined 3D Marine in 2007. Captain Fazioli has performed a wide range of surveys including tanker/tank barge safety (PSA) and cargo contamination surveys, dry cargo and containerization damage surveys, personal injury investigations, vessel damage surveys and P&I condition surveys. In addition, he has been retained by attorneys as a Consultant and as a testifying Expert Witness in support of litigation proceedings.

**3D MARINE** **Marine Consultants and Surveyors**

**3D MARINE USA, INC.**
12411 Donna Drive, Houston, Texas 77067
Tel (281) 444-9495 (24 hours) Fax (281) 444-8874
e-mail: firm@3dmarine.com

List of Admiralty Matters

Expert Witness Testimony by Capt. Marc Fazioli

1. C.A. No. 3:07-CV-00434
*Pelican Tug Co., L.L.C. vs. American Home Assurance Company*
In the United States District Court for the Southern District of Texas, Galveston Division
Deposition: July 2009
Trial Testimony: August 2009 - Judge Milloy
Case Description: Insurance Dispute - Partial Sinking
Attorneys: The Bale Law Firm

2. Cause No. 654-875
*Stephen L. Willis and Corrina J. Willis vs. Noble Drilling (US), Inc., Century Exploration of New Orleans, Inc. and King Engineering Corporation*
In the 24th Judicial District Court, Parish of Jefferson, State of Louisiana
Deposition: February 2010
Trial Testimony: May 2010 - Judge Darensburg
Case Description: Personal Injury - Hazardous Material Exposure
Attorneys: Martzell & Bickford

3. Cause No. 2008-10-005497-D
*Elias DeLeon vs. King Fisher Marine Service, Inc., King Fisher Marine Service, L.P. and Orion Marine Group, Inc.*
In the 103rd Judicial District Court of Cameron County, Texas
Deposition: March 2010
Case Description: Personal Injury - Line Handling
Attorneys: Chamberlain, Hrdlicka, White, Williams & Martin

4. Civil Action No. 08-CV-3160
*United States of America vs. Egan Marine Corporation, in personam, Motor Vessel LISA E., in rem, and Tank Barge EMC-423, in rem;* and *Egan Marine Corporation vs. Exxon Mobil Corporation and ExxonMobil Oil Corporation*
In the United States District Court for the Northern District of Illinois, Eastern Division
Deposition: May 2011
Trial Testimony: September 2011 - Judge Leinenweber
Case Description: Pollution Liability
Attorneys: Troutman Sanders

5. Case No. 09 L 6212
*Egan Marine Corporation vs. Exxonmobil Oil Corporation, Exxonmobile Oil Corporation, and Irving Francis Holm, Jr., Individually and/or as Agent of Exxonmobil Oil Corporation and/or Exxonmobile Oil Corporation*
In the Circuit Court of Cook County, Illinois
Deposition: May 2011
Case Description: Barge Explosion
Attorney: David R. Anderson

6. Civil Action No. 3:11-cv-00088
*Eugene Ceasar vs. Ryan Marine Services, Inc., Columbia Star, Inc., and Star Legacy, Inc.*
In the United States District Court for the Southern District of Texas, Galveston Division
Deposition: March 2012
Trial Testimony: March 2012 - Judge Hoyt
Case Description: Personal Injury - Fall While Boarding Vessel
Attorneys: Icenogle & Sullivan

7. Case No.: 4:11-cv-03447
*Oceaneering International, Inc. vs. Cross Logistics, Inc., National Union Fire Insurance Company of Pittsburgh, PA, Houston Casualty Company, National Liability and Fire Insurance Company, Northern Assurance Company, Markel Insurance Company, Zurich American Insurance Company and Navigators Insurance Company*
In the United States District Court for the Southern District of Texas, Houston Division
Deposition: March 2013
Trial Testimony: January 2014 - Judge Werlein
Case Description: Anchor Handling - Subsea Cable Damage
Attorneys: Crain Cubbage Wilson

8. *The Board of Pilot Commissioners for the Port of Corpus Christi Authority Public Hearing Regarding Rules for Piloting Vessels in the Port of Corpus Christi*
Hearing Testimony: June 2013
Description: Pilotage Guidelines
Client: Port of Corpus Christi Authority

9. Civil Action No. 12-1545, Section K, Magistrate 4
*Jonathan D. Carter vs. Hornbeck Offshore Transportation, L.L.C. and Hornbeck Offshore Operators, L.L.C.*
In the United States District Court for the Eastern District of Louisiana
Deposition: November 2013
Case Description: Personal Injury - Material Handling
Attorneys: Johnson, Johnson, Barrios and Yacoubian

10. C.A. No. 2012-43255
*Juan Javier Ledezma vs. Orion Marine Construction, Inc. and Orion Marine Group, Inc.*
In the 61st Judicial District Court of Harris County, Texas
Deposition: December 2013
Case Description: Personal Injury - Slip and Fall (Shipyard)
Attorneys: Chamberlain, Hrdlicka, White, Williams & Aughtry

11. Case No. 2:2013cv02385, Section F , Magistrate 3
*Grand Ltd., Laredo Offshore Services, Inc., Atlantic Specialty Insurance Company, Markel American Insurance Company, Procentury Insurance Company, Catlin Indemnity Company, United States Fire Insurance Company, and Certain Underwriters at Lloyd's vs. Linder Oil Company, A Partnership, Linder Energy Company, Louisiana General Oil Company, Destin Resources, L.L.C., Reserves Management, L.C. and Sojitz Energy Venture, Inc.*
In the United States District Court for the Eastern District of Louisiana
Deposition: February 2014
Case Description: Allision
Attorneys: Leefe Gibbs Sullivan & Dupre

12. Case No. 1:10-CR-00033
*United States of America vs. Dennis Michael Egan and Egan Marine Corporation*
In the United States District Court for the Northern District of Illinois, Eastern Division
Trial Testimony: May 2014 - Judge Zagel
Case Description: Seaman's Manslaughter
Attorneys: William O. Walters / Steven N. Fritzshall

13. Case No. 2:2013cv00398
*Plains Pipeline, L.P. and Phillips 66 Pipeline, LLC vs. Great Lakes Dredge & Dock Company, Great Lakes Dredge and Company, LLC of Louisiana, Dawn Services LLC, in personal, and the Dredge TEXAS, Tugs PACIFIC DAWN and COASTAL DAWN, and their Engines, Tackle, Furniture, Appurtenances, etc., in rem*
In the United States District Court for the Eastern District of Louisiana
Deposition: September 2014
Case Description: Pipeline Damage
Attorneys: Fowler Rodriguez

14. Cause No. 2012-24614
*Inocente Cepeda vs. Orion Marine Construction, Inc.*
In the 190th Judicial District Court of Harris County, Texas
Deposition: December 2014
Case Description: Personal Injury - Small Boat Operations
Attorneys: Munsch Hardt Kopf & Harr

15. Case No. 2:2013cv06278-LMA-SS
*Shell Offshore, Inc. vs. International Offshore Services, L.L.C., International Boat Rentals, Inc., Tesla Offshore, L.L.C. and International Marine, LLC*
In the United States District Court for the Eastern District of Louisiana
Deposition: February 2015
Trial Testimony: February 2016 - Judge Africk
Case Description: Mobile Offshore Drilling Unit Damage
Attorneys: Frilot

16. C.A. No. 3:13-cv-00202
*Profit Shipping Ltd. and Genel Denizcilik Nakliyati A.S. vs. M/V IMPERIAL SPIRIT, her Engines, Tackle, Appurtenances, etc., in rem; Ladarien Navegacion, S.A.,; and Northstar Ship Management Ltd., in Personam*
In the United States District Court for the Southern District of Texas, Galveston Division
Deposition: March 2015
Trial Testimony: August 2015 - Judge Hanks
Case Description: Collision
Attorneys: Eastham Watson Dale & Forney

17. Civil Action No. S13C-08033 ESB
*Alesia G. Lozito vs. Delaware River & Bay Authority vs. Survitec, SAS and DBC Marine Safety Systems, Ltd.*
In the Superior Court of the State of Delaware, in and for Sussex County
Deposition: October 2015
Case Description: Personal Injury - Lifesaving Equipment
Attorneys: Reeves McEwing

18. Civil Action No. 09-2092 (FAB)
*Eliezer Cruz-Aponte, et. al. vs. Caribbean Petroleum Corp., et. al.*
In the United States District Court for the District of Puerto Rico
Deposition: October 2015
Case Description: Shore Tank Explosion (Class Action)
Attorneys: Salas & Company

19. Civil Action No. 1:13-cv-00318-WS-C
*In Re: The Matter of Taira Lynn Limited No. 7, etc., et al., Praying for Exoneration From or Limitation of Liability*
In the United States District Court for the Southern District of Alabama, Southern Division
Deposition: January 2016
Case Description: Explosion during Barge Tank Cleaning Operations
Attorneys: Jones Walker

20. Cause No. 14-cv-0444
*Jason Woods and Steven Smith vs. Saipem America, Inc., et. al.*
In the 405th Judicial District Court of Galveston County, Texas
Consolidated with;
Cause No. 14-CV-0503
*Steven Smith, Individually and as Next Friend of XXXXXXXXX XXXXX, a Minor vs. Saipem America, Inc.; Saipem Norway; and Piling, Inc.*
In the 56th Judicial District Court of Galveston County, Texas
Deposition: March 2016
Case Description: Small Boat Allision
Attorneys: Bland & Partners

21. C. A. No. 3:14-cv-00247
*Efrain Irias vs. Starfleet Marine Transportation, Inc.*
In the United States District Court for the Southern District of Texas, Galveston Division
Trial Testimony: June 2016 - Judge Hanks
Case Description: Personal Injury - Heavy Weather
Attorneys: Legge Farrow Kimmitt McGrath & Brown

22. Case No.: 8:15 CV 1806-T-23-JSS
*Antoinette Dixon, as Personal Representative of the Estate of Robert L. Dixon vs. NYK Reefers Ltd., a foreign corporation; Cool Carriers AB, a foreign corporation; and NYK Cool AB, a foreign corporation*
In the United States District Court for the Middle District of Florida, Tampa Division
Deposition: July 2016
Case Description: Personal Injury - Crane Operations (Longshoreman Fatality)
Attorneys: Phelps Dunbar

23. Civil Action No. 15-5985
*Troy Matthiews and his wife Tracy Matthiews vs. Crosby Tugs, LLC*
In the United States District Court for the Eastern District of Louisiana
Trial Testimony: December 2016 - Judge Vance
Case Description: Alleged Surge Incident - Personal Injury
Attorneys: Frilot

24. Case No. 3:15-cv-00170
*In the Matter of Cooper Marine and Timberlands Corporation, as Owner Pro Hac Vice and Operator, and GATX Third Aircraft, LLC as Owner of the Barge CMT 123, Official No. 1067600, Praying for Exoneration From or Limitation of Liability*
Consolidated with;
Case No. 3:15-cv-350; *Kassandra Nieves, Individually and as Personal Representative of the Estate of Juan Nieves and his Surviving Heirs and Dependents vs. Cooper Marine and Timberlands Corporation, et. al.*
Consolidated with;
Case No. 3:15-cv-225
*Robert L. Coleman, Special Administrator for the Estate of Nicolas Perez Hernandez, and his Surviving Heirs and Dependents vs. Cooper Marine and Timberlands Corporation, et. al.*
In the United States District Court for the Eastern District of Arkansas, Jonesboro Division
Deposition: April 2017
Case Description: Barge Sinking (Longshoremen Fatalities)
Attorneys: Franke & Salloum / Bratton & O'Neal

25. Cause No. D-198065
*Armando Villafuerte vs. Antillana Holding Inc. a/k/a Antilla Holdings Inc., Transgas Shipping Lines SAC, Transgas International Inc., Associated Marine Services, Inc., Anthony Andre Garrett, Richard Phillip Lopez, Eugene Blackwell, and Colin Andrew Lynd*
In the 136th Judicial District Court of Jefferson County, Texas
Deposition: August 2017
Case Description: Personal Injury - Linehandling
Attorneys: Chamberlain, Hrdlicka, White, Williams & Aughtry

26. Civil Action No. 2:15-CV-1121
*Ergon - St. James, Incorporated vs. PRIVOCEAN M/V, her engines, tackle, apparel, furniture, etc., in rem*
Consolidated with;
Civil Action No. 2:15-CV-1137
*Bravo Shipping Ltd. vs. Privocean Shipping Ltd.*
Consolidated with;
Civil Action No. 2:15-CV-1206
*In re: In the Matter of the Complaint of Privocean Shipping Limited, as Owner of the M/V PRIVOCEAN, Petitioning for Exoneration From or Limitation of Liability; Bariba Corporation, as Managing Owner of the M/V PRIVOCEAN, Petitioning For Exoneration From or Limitation of Liability*
In the United States District Court for The Eastern District of Louisiana
Trial Testimony: April 2018 - Judge Zainey
Case Description: Allision
Attorneys: Jones Walker

27. C.A. No. 17-00585
*Devin Barrios and Megan Barrios vs. Centaur, L.L.C., Circle, L.L.C. and River Ventures, L.L.C.*
In The United States District Court for the Eastern District of Louisiana
Trial Testimony: November 2018 - Judge Milazzo
Case Description: Personal Injury - Equipment Handling
Attorneys: Jones Walker

28. Cause No. 2015-51380
*Roel Lopez vs. Chipolbrok America, Inc., Chipolbrok Chinese-Polish Joint Stock Shipping Company and Schroder Marine Services, Inc.*
In the 125th Judicial District Court of Harris County, Texas
Deposition: February 2019
Case Description: Personal Injury - Longshoreman
Attorneys: Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz

3D MARINE Marine Consultants and Surveyors

3D MARINE USA, INC.
12411 Donna Drive, Houston, Texas 77067
Tel (281) 444-9495 (24 hours) Fax (281) 444-8874
E-mail: firm@3dmarine.com

**3D MARINE USA, INC. - 2019 Schedule of Legal Fees**

**Captain Marc Fazioli**

| | |
|---|---|
| Review of Documents: | $275.00 / hour |
| Court/Deposition Testimony: | $400.00 / hour with minimum of four hours ($1,600.00) plus expenses (cost +10%) |
| Retention Fee[1]: | $5,000.00 |

plus necessary expenses as incurred

[1] A Retention Fee may be required when appointed by clients requiring Expert Witness / Consulting Services, and will be assessed on a case-by-case basis.